WES-JULIAN CONSTRUCTION CORPORATION *vs.* COMMONWEALTH.

Suffolk. November 9, 10, 1966. — January 10, 1967.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Contract,* Building contract.

Under a carefully prepared, formal written contract between the Commonwealth and a highway contractor providing that no extra compensation or damages would be allowed to the contractor by reason of delays in the performance of his work caused by the Commonwealth, that the Commonwealth could delay the work if it "deem[ed] it best for its interests to do so," and that if such delays occurred "the time for completion of work shall be extended in whatever amount is determined to be equitable," the contractor was not entitled to recover damages for delays caused by the Commonwealth even if its conduct was "arbitrary and capricious." [595–597]

G. L. c. 30, § 39J, did not preclude a highway contractor from being barred by the provisions of his contract with the Commonwealth from

recovering damages from it for delays in the performance of his work caused by its alleged dilatoriness in connection with its subsequent entry into and enforcement of a contract between it and a railroad for the performance by the railroad of work necessary for completion of the contractor's work ·on schedule, where a conclusion was not warranted that any "decision" by the Commonwealth pertaining to the railroad was made in "bad faith, fraudulently, capriciously, or arbitrarily." [597]

Under a highway construction contract with the Commonwealth specifying for embankment work up to a designated elevation ordinary borrow containing not more than 10% of material passing through a certain mesh sieve and above that elevation ordinary borrow containing not more than 35% of material passing through that sieve, and providing that payment for all ordinary borrow would be made "for the volume in cubic yards . . . at . . . [a combined] unit price bid" by the contractor in the expectation of supplying borrow of both types in the ratio indicated in the specifications and plans, it was held that the contractor, upon the Commonwealth's rightfully ordering him to supply for the embankment only borrow which would pass the 10% test, was entitled to recover from it a substantial increase in cost of the borrow supplied in accordance with the order.   [600–601]

Under a highway construction contract with the Commonwealth calling for the excavation from the roadway of existing, ordinary material and of existing, heavy roadway material costing much more to remove, for which the contractor submitted a combined bid of an amount per cubic yard between the two costs, and stating that "An increase or decrease in the quantity of any item shall not be regarded as cause for an increase or decrease in the prices," the contractor, upon the Commonwealth's rightfully decreasing the quantity of the ordinary material to be removed, was not entitled to recover from it the increased cost per cubic yard of excavation of all material.   [601–602]

PETITION filed in the Superior Court on April 5, 1961.

The case was heard by *Chmielinski,* J.

*Burton Peltz,* Assistant Attorney General, for the Commonwealth.

*Frederick R. Walsh* for the plaintiff.

SPIEGEL, J.   This is a petition brought under G. L. c. 258 against the Commonwealth in which the petitioner seeks damages allegedly sustained for breach of a written contract for the construction of a section of the Southeast Expressway.   The claims of the petitioner are for extra work, increased costs, and expense, totaling $276,745.66.   The case was referred to an auditor whose findings of fact were not to be final.   He found for the petitioner with respect to

some of its claims. At a trial before a judge without jury the evidence consisted of the auditor's report, numerous exhibits, and the testimony of witnesses. The judge found for the petitioner and assessed damages in the sum of $271,911.66 plus an item of interest which was "to be added to the total amount of the finding." The case is here on exceptions by the respondent to the judge's "denying its requests for rulings and in making certain findings and assessment of damages."

We summarize the material findings of the judge. The contract provided that the work was to conform to the 1953 Standard Specifications for Highways and Bridges (the Blue Book). The total amount to be paid for the work specified was $4,111,998. "[W]ork was to be completed March 31, 1959, with an extension of time to June 1, 1959. Work . . . was started May 4, 1956 . . . and completed on May 29, 1959." On June 16, 1959, the Commissioners of Public Works voted to approve, as of May 29, 1959, the work done by the petitioner under the contract, "the engineer in charge having reported that . . . [the] work called for under . . . [the] contract had been completed . . .. At various times during and toward the end of the construction work and after its completion the officers of petitioner discussed various claims for extra pay arising from the performance of the contract with representatives of the Commonwealth, and were informed that the Commissioners were not in a position to settle them, and that the petitioner should correlate . . . [its] data, submit it as a claim and bring suit."

The auditor made "[c]ertain findings of fact" with reference to several items of increased costs totaling $13,685.67. The respondent "admitted" these items.

The petitioner claims there is due it the sum of $146,371.95 for additional borrow[1] of a type more expensive than that specified in the contract. "[T]wo types of borrow were

---

[1] Webster's New International Dictionary (3d ed.) defines "borrow" as follows: "[M]aterial (as earth or gravel) taken from one location (as a borrow pit) to be used for fill at another location."

specified in . . . the contract to be used above and below . . . [a certain] elevation. One kind consisted of material of which not more than 10 per cent would pass through a 200 mesh sieve to be used below elevation 8[2] and was the better of the two types with a fair market value of $1.75 a cubic yard. The other . . . was material of which not more than 35 per cent would pass through a 200 mesh sieve to be used above elevation 8 with a fair market value of $1.30 per cubic yard. . . . On or about December 11, 1956, the petitioner was stopped from using 35 per cent borrow . . . [by the respondent's resident engineer].[3] . . . Some of this material went below elevation 8 but sometime in April, 1957, petitioner was instructed by . . . [the resident engineer] to use only borrow which would pass the ten per cent test, and from this date to' the completion of the contract, substantially all of the borrow was of this latter grade. The contract . . . provided that borrow . . . in peat excavation areas (underwater backfill) to elevation + 8.00 by the dry fill method shall contain not more than 10 per cent by dry weight of material passing the No. 200 mesh sieve and that all other borrow . . . for embankment from elevation + 8.00 to the top of the subgrades shall contain not more than 35 per cent by dry weight of material passing the 200 mesh sieve. The bid of the petitioner, which became a part of the contract, included the delivery of 895,000 cubic yards of ordinary borrow complete in place at a combined price of . . . $1.60 a cubic yard . . . [for] a total price of $1,432,000.00 to be paid for the amount agreed to be supplied. The petitioner delivered and was paid for the 895,000 cubic yards at the above price and also delivered and received the same price for an additional 80,813 cubic yards, making a total of 975,813 cubic yards delivered and paid for at the same price ($1.60). The rela-

---

[2] "Elevation 8 refers to a point 8 feet above mean sea level, which would be about high water mark at flood tide."

[3] The reason, according to the auditor's report, was that "[T]here had been a heavy downpour of rain and the 35% grade of borrow was not satisfactory because it had become just mud and could not be properly compacted or worked into the project."

tive ratio of the borrow specified in the contract of 895,000 yards was two parts below elevation . . . and one part above . . . . [The petitioner's] engineer testified that 9,711 cubic yards of borrow did not meet the 10 per cent test, and that he was 'uncertain' about an additional 17,009 cubic yards. Deducting these from 975,813 cubic yards leaves a total of 949,093 cubic yards for which the petitioner makes claim at 15 cents per cubic yard, or a total amount of $142,363.95.''

Between June 18, 1956, and January 3, 1959, the petitioner had ''various . . . installations . . . stakes and . . . platforms'' built within the ''contract right of way'' and was obligated to keep and maintain all of these in good working order during the entire period of construction. ''The respondent allowed the Dorchester Yacht Club to erect and maintain its buildings within the contract easement work area so that the petitioner was compelled to hire an additional watchman to police the area for the entire construction period . . . [at a cost] of $11,289.04. . . . The contract . . . provided that all iron castings would be . . . [furnished] by the respondent to the petitioner on . . . [its] trucks at the Norfolk State Prison without cost. Petitioner was repeatedly assured over a period of many months that . . . [the] castings would be available at . . . [the] prison when needed and was dissuaded from purchasing them during . . . period. In the interim there were three successive . . . increases in the market price . . . . [Finally] the petitioner was . . . informed that they would not be available at . . . [the] prison and that they would have to be purchased by the petitioner on the open market. This resulted in an increased cost of $1,657.65 to the petitioner.''

The contract was executed on March 27, 1956, and under its terms the petitioner was to commence its work within fifteen days from that date. The contract had the following specific provision: ''Temporary and permanent changes of tracks and telegraph lines of the Railroad made necessary by or to clear, permanent work of the Contractor, will

be made by the Railroad without expense to the Contractor." It "further provided for the construction of a temporary bridge and the removal of the entire existing superstructure then in place over the N.Y., N.H. & H. R.R. tracks at Savin Hill Avenue."

It was not until October 3, 1956, that the respondent "enter[ed] into a contract with the N.Y., N.H. & H. R.R. . . . and did not compel the commencement of the removal and relocation of the railroad tracks . . . [and so forth] until on or about . . . [May 10, 1957] . . . and failed to compel the completion of . . . [the] work before seventeen months." The respondent failed to include a completion date in its contract with the railroad and did not undertake any court action to compel the railroad to complete its work in a reasonable time. Because of these delays the "petitioner was put to increased costs" totaling $89,341.35.

"The contract . . . called for 135,000 cubic yards of . . . excavation; 88,000 cubic yards of overload and counterweight and 47,000 cubic yards of 'other material.' The overload and counterweight was ordinary, easily removable material costing about 30 cents per cubic yard to remove; the 'other material' consisted of curbing, brick and other heavy material costing about $2.30 per cubic yard to remove or excavate. The petitioner submitted a combined bid, based upon the above ratio of $1.00 per cubic yard." The respondent reduced the amount of these materials required to be excavated, but not by the same proportion in which they originally were to be excavated. "The petitioner therefore, incurred an increased cost of $13,574.00."

From the foregoing the judge found: "1. The petitioner is entitled to recover for the increased cost of the 'borrow' for the reason that its combined bid was destroyed by the respondent by reason of the arbitrary change of the ratio of material. 2. The petitioner is entitled to recover for the increased cost of excavation for the reason that its combined bid was destroyed by the respondent by reason of the arbitrary change of the ratio of material. 3. The conduct of the respondent was so arbitrary, wilful and capricious

as to cause undue delay and financial hardship to the petitioner."

The judge assessed damages in the sum of $271,911.66 with interest at 5% from August 2, 1959, "which was 65 days after May 29, 1959, when the roadway was satisfactorily completed and opened for public use," to November 5, 1964, the date of the judge's finding.

1. The claims based on delay.

In the absence of a specific contract provision to the contrary, the respondent would be bound to refrain from causing delay in the petitioner's commencement or performance of the contract, and the petitioner could recover for breach of contract for such delays. *Charles I. Hosmer, Inc.* v. *Commonwealth,* 302 Mass. 495, 502. *Morgan* v. *Burlington,* 316 Mass. 413, 417. However, the contract in the instant case did contemplate the possibility of delay. It provided that extension could be granted by the respondent but that no extra compensation or damages for delay would be allowed. The contract provided in part, "When delay occurs due to reasonable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to acts of God, . . . acts of the Government, acts of the State or any political subdivision thereof, acts of other contracting parties over whose acts the Contractor has no control . . . the time for completion of work shall be extended in whatever amount is determined to be equitable." It also provided that an extension would be granted if commencement of the work was delayed by the respondent and the respondent was given the power to delay the commencement of the work "if . . . [it] shall deem it best for its interests to do so," in which event the petitioner "shall have no claim for damages on account of such delay, but shall be entitled to an equivalent extension of time in which to complete . . . the work . . . . The . . . [petitioner] shall have no claim for damages on account of any delay on the part of the . . . [respondent] in performing or furnishing any work or materials to be . . . furnished by the . . . [respondent] in connection with the execution of the work cov-

ered by the contract.'' Another clause stated: ''In consideration of the foregoing premises the Commonwealth agrees to pay and the Contractor agrees to receive as full compensation . . . for all loss or damage . . . from any delay or from any unforeseen obstruction or difficulty encountered in the prosecution of the work, . . . and for all expenses incurred by or in consequence of the suspension or discontinuance of the work as herein specified . . . such unit prices as are set out in the accompanying proposal . . ..''

These provisions of the contract exculpate the respondent from any liability it would otherwise have for delays which it caused, even if its actions were ''negligent, unreasonable or due to indecision.'' *Charles I. Hosmer, Inc.* v. *Commonwealth,* 302 Mass. 495, 503. Accord, *Coleman Bros. Corp.* v. *Commonwealth,* 307 Mass. 205, 216; *Chas. T. Main, Inc.* v. *Massachusetts Turnpike Authy.* 347 Mass. 154, 162, 163. But the petitioner argues that the judge found, ''The conduct of the respondent was so arbitrary, wilful and capricious as to cause undue delay and financial hardship to the petitioner'' and consequently, it is entitled to recover. It cites language in the *Hosmer, Coleman,* and *Main* cases in support of its argument. The question thus presented for our decision is whether the contract in the instant case is so drafted as to relieve the respondent from liability for delay even in these circumstances.

In *Marsch* v. *Southern New England R.R.* 230 Mass. 483, 495–496, the defendant was relieved from liability for delays even though its conduct was alleged to be '' 'not . . . in good faith and for any legal cause or reason within the intention of said parties, but . . . solely for the purpose of harassing, embarrassing and annoying the plaintiff and for the purpose of causing him great inconvenience, expense and damage . . . in order to induce the plaintiff to refuse to proceed with said contract and to abandon the construction and completion of said roadway,' '' by the following clause in its contract with the plaintiff: '' 'Notwithstanding anything in this Contract contained, the Corporation shall

have the right to suspend the progress of the work or any part thereof as often and for such time as they shall see fit . . . [and] the Contractor shall not have any claim against the Corporation for any damage which the Contractor shall sustain by reason of any delay in the progress of the work arising from such suspension or from any act or omission of the Corporation . . . .' " We held "there is nothing contrary to public policy in an agreement of this kind which the parties have voluntarily and advisably made."

The contract in the instant case gave the respondent the power to delay the work if it "deem[ed] it best for its interests to do so" and was more favorable to the contractor than the contract in the *Marsch* case in that it provided for extensions of time to be given for completion of the work in the event the respondent exercised its power to delay. Furthermore the contract expressly negatived any right in the petitioner to receive damages for delay. As we said in *Chas. T. Main, Inc.* v. *Massachusetts Turnpike Authy.* 347 Mass. 154, 162, "We have before us a carefully prepared written agreement, executed after extensive preliminary studies. It deals with a large project." Just as in that case "we should be slow to conclude that the parties omitted an essential term by inadvertence or left that term to implication," in the instant case "we should be slow to conclude" that the parties meant to limit the broad power of the respondent, expressly conferred upon it, to delay the work.

Some reliance is placed by the petitioner on the language in the *Hosmer, Coleman,* and *Main* cases which, it may be argued, suggest that "arbitrary, capricious or fraudulent action, . . . [or action] in bad faith or under such a gross mistake as to be tantamount to fraud" would enable the petitioner to recover for delay even where the contract provided otherwise. The language now pressed upon us was doubtless included to avoid deciding issues not then before us upon the facts of those cases. This case is governed by the *Marsch* case. Even if we assume that the judge was warranted in finding that the conduct of the respondent was

"arbitrary and capricious," the petitioner is not entitled under this contract to recover damages for delays caused by the respondent in view of the specific provisions of the contract regarding delay. The petitioner is not aided by G. L. c. 30, § 39J.[4] Even if we further assume that there was a "dispute" between the parties because there was delay on the part of the railroad to perform its work, and that this "dispute" concerned an interpretation of provisions of the contract, we are unable to conclude that the Commonwealth made a "decision" or that if it did make one that it was made in "bad faith, fraudulently, capriciously, or arbitrarily."

The respondent may have determined that litigation would not result in any speedy action. There was no provision in the contract with the railroad which required it to commence work within a definite period and to conclude within a definite period. The failure of the respondent to include some such provision in its contract with the railroad is not evidence of a capricious or arbitrary decision.

2. The claims based on the changes in borrow requirements.

The steps in the formation of this contract were as follows. A "Notice to Contractors" was published which indicated the general nature of the work to be done and invited bids. This notice also constituted part of the "Instructions to Bidders," in which reference was made to the Blue Book. The Blue Book spelled out in great detail the procedure for bidding and general specifications of the work to be done.[5]

---

[4] The statute provides in part: "[A] decision . . . on a dispute . . . arising under . . . [a] contract shall not be final or conclusive if such decision is made in bad faith, fraudulently, capriciously, or arbitrarily, is unsupported by substantial evidence, or is based upon error of law."

[5] It stated, under Article 2, that proposal forms would be furnished by the respondent which would include a set of "Special Provisions" describing in detail the work to be done and "approximate estimates" of the work to be done; "[a] blueprint set of the project plan and profile; [and a] copy of the detail sheets showing the preliminary estimate of quantities with information pertinent thereto."

Article 3 of the Blue Book stated: "A. All bids will be compared on the estimate of quantities of work to be done, as shown in the Proposal. These

In the portion of the "Special Provisions" dealing with the embankment work to be done, it was stated, "The Contractor has the option of using either hydraulic fill or dry fill material to backfill the peat excavation areas and form the embankment of the roadway . . . .

"Material for backfilling areas of peat excavation to elevation + 8.00 . . . shall conform to the sieve analysis hereinafter specified, as underwater backfill under the Item Ordinary Borrow. . . .

"Material placed from elevation + 8.00 to top of subgrade . . . shall comply to the requirements under the Item Ordinary Borrow. . . ."

"*Item A6–1        Ordinary Borrow        Cubic Yards*

"This work shall conform to the applicable provisions of Section A–6 [of the Blue Book] with the following additions and modifications: . . .

"(a) Borrow materials to be used as fill in peat excavation areas (Under-water Backfill) to elevation + 8.00 . . . shall be as follows: . . .

"2.   Dry Fill Method — All materials shall contain not more than 10 per cent by dry weight of material passing the No. 200 mesh sieve. . . .

"(b) All other borrow materials for embankment from elevation + 8.00 to the top of subgrade shall be as follows: . . .

"(2) *Dry Fill Method* — All embankment material shall contain not more than 35 per cent by dry weight, of material passing the 200 mesh sieve. . . .

quantities are approximate only, being given as a basis for the comparison of bids, and the . . . [respondent] does not expressly or by implication agree that the actual amount of work will correspond therewith, but reserves the right to increase or decrease the amount of any class or portion of the work, as may be deemed necessary or expedient . . .. Bidders are required to submit their estimate upon the following express conditions, . . . viz: An increase or decrease in the quantity for any item shall not be regarded as cause for an increase or decrease in the prices, . . . except as provided in the contract. (Also see Article 22, Alteration of Work.)

"B. The excavation, masonry and other parts of the work have been divided into classes and items in order to enable the bidder to bid on the different portions of the work in accordance with his estimate of their cost, so that in the event of an increase or decrease in the quantities of any particular class of work the actual quantities executed may be paid for at the price bid for that particular class of work."

"*Compensation* . . . Payment for Ordinary Borrow will be made for the volume in cubic yards . . . at the unit price bid in the Proposal for the Item, Ordinary Borrow."

Article 22 of the Blue Book provided that, "Should it be found desirable by the Engineer to make alterations in the form or character of any . . . work done . . . [he] may order such alterations to be made . . . provided that in case such alterations increase the cost of the work the Contractor shall be remunerated at prices based on prices allowed on the same character of work under the specifications . . . .

". . . [T]he Contractor shall accept payment in full at the contract unit prices for the actual quantities of the work done."

The petitioner filled in the detail sheets in which only one unit price was provided for all ordinary borrow. Its bid was accepted and the contract formed thereby incorporated all the provisions of the Blue Book as modified and supplemented by the "Special Provisions."

From the foregoing provisions of the contract it is clear that the respondent had the power to change the specifications of the borrow to be used above elevation + 8.00 and to require that it pass the 10% test rather than the 35% test, without breach of the contract. See *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190, 203–206. The only issue for our decision on this phase of the case is whether the respondent can bind the petitioner to a unit price for ordinary borrow which was calculated on the assumption that all the ordinary borrow above elevation + 8.00 needed to pass only the 35% test.

In the Blue Book, § A6.11, it is stated that borrow "shall be classed as ordinary borrow, gravel borrow, sand borrow, etc., and shall be of a quality satisfactory to the Engineer and as hereinafter specified." Section A6.20 says in part: "Ordinary borrow shall consist of a material satisfactory to the Engineer and not specified as gravel borrow, sand borrow, or other particular kind of borrow." Other subsections of § A6 describe other types of borrow, not relevant here.

We think it is clear, from the Special Provisions which modify and add to the Blue Book specifications for borrow, that in this contract the distinction between borrow which is required to pass only the 35% test and borrow required to pass the 10% test is as great as the distinction, for example, between ordinary borrow and gravel borrow. It seems to us that a single unit price for ordinary borrow was necessarily calculated on the assumption that these two grades of ordinary borrow would be supplied in the ratio indicated in the specifications and plans. The petitioner was precluded from submitting separate unit prices by the form supplied by the respondent. In all likelihood, if the parties had foreseen the possibility that the 35% test borrow would prove so unsatisfactory that it could not be used at all, they would have provided for separate unit prices for 10% test and 35% test borrow. We are of opinion that the contract must be fairly interpreted as containing separate unit prices for the two types of ordinary borrow. Those prices are readily calculable from the relative values of the two types of borrow, the relative amounts required by the specifications, and the combined unit price which was actually bid. The judge made those calculations and we are satisfied that they are supported by the evidence.

The case of *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190, 206, cited by the respondent, is distinguishable from the instant case. There "[t]he special references . . . [in the contract] show[ed] that alterations in . . . [the] dimensions [of the project] by orders of the engineers were within the contemplation of the parties. The increase in the proportion of the . . . materials . . . was likewise comprehended within a fair interpretation of the . . . [contract]." *Thomas Bros. Corp.* v. *Commonwealth,* 345 Mass. 384, cited by the respondent, is likewise not in point. In that case it was not shown that the contractor supplied or was required to supply a higher grade of borrow than that required by the Commonwealth and hence was not entitled to recover for the increased unit cost.

It is clear in the case at bar that the parties did not con-

template the replacement of all 35% test borrow with 10% test borrow at a unit price based on a weighted average of the two types.

3. The claims based on the changes in excavation requirements.

Item A2–1 of the Special Provisions entitled "Roadway Earth Excavation" provided for "clearing and grubbing, the removal of overload, counterweight, and preload embankment to the limits shown on the Plans, the removal and disposal of existing pavements, base courses, walks, curbings, timber ties, signs, and all materials not provided for by other Items in the Proposal." Section A–2 of the Blue Book deals with "Roadway Excavation." Various classifications of roadway excavations are defined such as "Roadway Earth Excavation" (A2.11), "Class A Rock Excavation" (A2.12), "Peat Excavation" (A2.13), and "Macadam Excavation" (A2.14). This last section provides: "If the existing macadam surface is not required to be utilized as a base course or stacked, the removal and satisfactory disposal of such material will be included in the item for Roadway Earth Excavation." "Roadway Earth Excavation" includes: "The removal . . . of materials such as clay, sand, gravel, loam, decomposed rock and boulders of less than one cubic yard . . . of . . . dry stone masonry walls . . . guard rail and fences . . . [s]tripping layers of unsuitable top soil . . . [and] [a]ny excavation not otherwise classified in these specifications . . . ."

Item A2–1 of the Special Provisions makes special provision for payment for "The removal and disposal of the earth overburden materials in the peat excavation area . . . [and of] . . . the reinforced concrete pavement on Napier Park," at a rate different from other types of excavation covered in this section.

The provisions of the Blue Book indicate that the excavation of existing roadway surfaces is customarily grouped with the excavation of clay and loam and is paid for at a uniform unit price. The contract contained a special exemption for the removal of reinforced concrete from the

unit price under item A2–1 but no such exemption for other roadway materials involved in this contract. Even though the judge found that the cost of removing the existing roadway surfaces greatly exceeded the cost for the removal of the overload, counterweight and preload embankments, we cannot say that separate unit prices were contemplated, as they were with respect to the borrow materials.

The language of the contract stating, ''An increase or decrease in the quantity for any item shall not be regarded as cause for an increase or decrease in the prices . . . except as provided in the contract,'' governs the instant situation and the petitioner is not entitled to recover for its increased costs due to the decision of the respondent not to have certain parts of the overload and counterweight materials removed.

4. Miscellaneous claims.

The only argument made by the respondent with regard to the remaining items of damage awarded to the petitioner appears to be that the findings of the judge are not supported by the evidence. We do not agree. We discern no need for further discussion of the evidence. We are satisfied from our review of the record that the testimony was sufficient to support the judge's findings on these items.

5. In accordance with the foregoing, the respondent's requests for rulings numbered 1, 2, 3, and 4, relating to delay, and request numbered 7 relating to excavation, should have been granted. We see no need for stating these somewhat lengthy requests.

6. The entry is to be: Exceptions sustained as to the claims based on delay and changes in the excavation requirements, totaling $102,915.35; all other exceptions are overruled. Judgment is to be entered for the petitioner in the sum of $168,996.31 with interest at 5% from August 2, 1959, to November 5, 1964,[6] and with interest at 6% per annum thereafter.

*So ordered.*

---

[6] No question is raised by the parties regarding this computation of interest at 5% per annum. See G. L. c. 30, § 39G.