STATE LINE CONTRACTORS, INC. *vs.* COMMONWEALTH.

Suffolk.    February 4, 1969. — July 1, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Contract*, Building contract, Modification. *Practice, Civil*, Auditor: findings. *Interest*.

In a proceeding against the Commonwealth by a contractor for construction of a section of highway for it, conclusions were warranted that authorized agents of the Commonwealth agreed with the contractor that a rest area should be built simultaneously with the contractor's work on the adjacent portion of the main highway, and that prevention of such simultaneous performance by failure of the Commonwealth's representatives to seasonably procure a necessary easement for the rest area did not merely result in delay, for which compensation would be barred by specific provisions of the construction contract, but constituted a breach of the rest area agreement causing the contractor to do extra work and entitling it to compensation therefor upon complying with the contract requirements for compensation for extra work. [315–316]

Where it appeared that, after the making of a contract with the Commonwealth for highway construction specifying a certain unit price for ledge removal, further boring information was obtained resulting in an "alteration" of the contract and revision of the plans on the basis that no ledge was expected to be encountered, and that in fact a substantial quantity of ledge was encountered and removed by the contractor for which payment at the specified unit price was made, it was held that

any greater payment for the ledge removal was barred either because the unit price was unaffected by the "alteration" and revision of the plans or because, if the unit price was impliedly cancelled thereby, the ledge removal would have been extra work and the contractor had failed to comply with the requirements of the contract respecting extra work. [316–319]

A contractor constructing a section of highway under a contract with the Commonwealth was not entitled to payment for extra work alleged to have been caused by failure of the Commonwealth's representatives to take certain action where it appeared that the contractor had not complied with notice provisions of the contract respecting extra work. [319–320]

Failure of a contractor which had constructed a section of highway for the Commonwealth to prove the "actual cost" of certain extra work barred recovery by the contractor of payment for the extra work by reason of a provision of the construction contract making "actual cost" a basic item in the calculation of an amount payable for extra work. [320–321]

Properly construed, a contract with the Commonwealth for highway construction, although providing for a determination by the Commonwealth's engineer of the quantity of certain work done at a unit price, did not preclude the contractor from challenging the accuracy of the engineer's determination; and, upon proving that the quantity of work done was in excess of the quantity determined by the engineer, the contractor was entitled to payment for such excess at the unit price as work performed under the contract and not as extra work. [321–323]

In a proceeding against the Commonwealth under G. L. c. 258 by a highway contractor, interest on disputed claims of the contractor which were finally allowed should be computed from the date of filing of the petition. [323]

PETITION filed in the Superior Court on January 21, 1966.

The case was heard by *Kalus*, J.

*John E. Sheehy*, Assistant Attorney General, for the Commonwealth.

*Dean E. Nicholson* (*Samuel H. Cohen* with him) for the petitioner.

KIRK, J. By this amended petition under G. L. c. 258 State Line Contractors, Inc. (State Line), sought damages for the alleged breach of a contract to construct a section of Interstate Route 495. The petition as amended stated eleven claims, ten of which were based on accounts annexed. The case was referred to an auditor (findings of fact not final) and, after recommittal for further findings, was

tried before a judge sitting without jury. G. L. c. 258, § 2. The judge heard the case on the auditor's reports and the testimony of three engineers (called by the Commonwealth) in the Commonwealth's Department of Public Works (D. P. W.). The judge found for the Commonwealth on two claims, and one claim was waived. These are not before us. On eight of the claims he found for State Line for a total of $225,974.45 plus an item of interest. The Commonwealth has made an offer of judgment encompassing three of these eight claims. The dispute now centers on the remaining five claims plus the item of interest.

The Commonwealth's amended outline bill of exceptions alleges error in the denial of its motion to strike portions of the auditor's reports, to the denial of fifteen of its requests for rulings and to the award of interest. We disregard exceptions to the judge's findings. See *Stella* v. *Curtis*, 348 Mass. 458, 461.

Our mission under the statute is to determine whether the judge's decision can be supported in law or must as matter of law be reversed. *Charles I. Hosmer, Inc.* v. *Commonwealth*, 302 Mass. 495, 498, 499. *Arthur A. Johnson Corp.* v. *Commonwealth*, 306 Mass. 347, 351. *M. DeMatteo Constr. Co.* v. *Commonwealth*, 338 Mass. 568, 572.

We first summarize the basic facts concerning the formation of the contract as derived from the documentary evidence and from the findings of the judge who adopted the findings of the auditor and made some of his own. The oral evidence heard by the judge in substance affected only the claim herein referred to as the "Earth Excavation Claim." The result is that as to all other claims we have before us all that was before the judge and are in as good position as he to decide the claims. Facts of significance to a particular claim will be stated in the opinion when the claim is considered.

### THE FORMATION OF THE CONTRACT.

In June, 1962, the D. P. W. issued a "Notice to Contractors" requesting the submission of proposals for the

construction of a section of Interstate Route 495 (including
two bridges) in the city of Haverhill. Plans and an esti-
mate of quantities were made available to the bidders. The
"Instructions to Bidders" issued with the notice disclaimed
any guaranty that statements of borings or of the estimated
quantities were even approximately correct and were ex-
plicit that bidders were to rely upon their own investigation
and research and not to rely upon any estimates contained
in the plans.

On August 21, 1962, contract numbered 9499 was en-
tered into between the Commonwealth and State Line [1]
based upon a proposal submitted by State Line for the
work. The contract by reference incorporated the proposal,
the "Notice to Contractors," certain "Special Provisions"
and the "Standard Specifications for Highways and Bridges
1953" adopted by the Commissioners of Public Works (the
Blue Book).

The contract called for the construction of 1.231 miles of
the highway between stations 255+00 and 320+00,[2] includ-
ing the construction of two bridges, one bridge over Newton
Road; the other bridge with approach ramps over Amesbury
Road. The contract established unit prices for various
items, payment to be based upon the quantities of such
items actually used, furnished or performed.[3] The con-
tractor was to accept payment as full compensation for all
loss or damage arising out of "any delay or from any un-
foreseen obstruction or difficulty encountered in the prosecu-
tion of the work." The contract was originally to be com-
pleted by July 15, 1964. The date for completion was
extended to September 17, 1964, by the D. P. W. and the
work was finished on December 2, 1964.

---

[1] Then the E. V. Del Duca Construction Co. Inc.

[2] A "station" is a fixed point along the line of the highway. Stations are
located exactly 100 feet apart.

[3] The following items and unit prices in State Line's proposal are of par-
ticular importance in the litigation: A2–1, roadway earth excavation, fifty-six
cents a cubic yard (quantity 885,600). A2–2, class A rock excavation, fifty-six
cents a cubic yard (quantity 166,500). A6–1, ordinary borrow, sixty cents a
cubic yard.

The Blue Book contained articles covering in detail matters pertaining to highway contracts with the Commonwealth, such as alteration of work (art. 22), extra work (art. 23), claims of contractor (art. 58) and scope of payments (art. 78), in addition to other provisions which will be referred to when pertinent.

The D. P. W.'s original cross-section plans for the proposed highway indicated the existence of solid ledge "in the main highway between Stations 295 and 308 and also in some areas of the North West ramp. In places where ledge was to be encountered, the DPW plans called for construction of one-to-four [fairly steep] ledge slopes. Where no ledge was to be found, the plans called for construction of two-to-one [fairly level] earth slopes." In essence, the contract required the contractor to excavate existing terrain which was above the proposed levels for the roadway, and to fill those areas which were lower than the proposed levels. Once a roughly level roadbed was laid out, the final roadway would be built up in lifts of various gradations of materials topped off by the asphalt surface. From the original estimates and cross-sections, and by implication from the inclusion of an item of ordinary borrow, it was anticipated that the amount of material excavated from high ground would not be sufficient to fill in the areas of low ground and that there would be no waste materials.

Before commencing work State Line made a survey of the boring plans submitted by the D. P. W. and concluded that the indications of solid ledge on the D. P. W. plans were inaccurate. The D. P. W. resident engineer was so informed. New boring examinations were made by the D. P. W. resident and bridge engineers and no ledge was encountered in the areas shown on the D. P. W. original plans. Additional borings were then made and this information was adopted by the engineer who drew up new cross-section plans indicating no ledge in the line of proposed excavations. These new details required a basic change in the original plans. All slopes would be the less steep two-to-one earth slopes, with the result that substantially larger

amounts of earth would have to be excavated and disposed of and the one-to-four slopes for ledge would be eliminated.

Preliminary to the necessary changes in plans, discussions between representatives of State Line and "personnel" [4] of the D. P. W. were held during the latter part of 1962 and through the spring of 1963. Under art. 30 of the Blue Book ". . . Where conditions make it necessary or desirable for major deviation from the approved plans, such changes shall be made as specified in Article 22 [Alteration of Work], upon authorization in writing by the Engineer."

The discussions were directed toward an alteration of the original contract whereby a rest area would be built adjacent to the highway between stations 281 and 298 at the same unit prices as in the original contract. State Line informed the D. P. W. personnel that it would build the rest area at those prices only if it could be constructed simultaneously with the main highway embankment. State Line was advised by the D. P. W. personnel that it could be so done. On March 18, 1963, the district highway engineer in writing outlined to State Line a proposed alteration with estimated additional cost covering in part the use of surplus excavated materials to construct the rest area and to flatten median slopes. The communication ended, "Please signify your willingness to perform this additional work at contract unit prices in order that the alteration can be prepared." A copy of this communication was sent to the chief engineer.

On March 27, 1963, State Line advised the D. P. W. in writing that it would perform the proposed alteration No. 1 at the specified prices provided it built the rest area simultaneously with the roadway embankment. In the interval between the letters of March 18, 1963, and March 27, 1963, State Line "spoke to DPW men regarding their understand-

---

[4] The "personnel" of the D. P. W. variously described in the auditor's reports as "agents," "representatives" and "personnel," were identified in his supplemental report as the resident engineer of the project, the construction engineer for district 5 and the assistant construction engineer for district 5. District 5 was the geographical area (Essex County) of D. P. W.'s operations within which the project was being accomplished.

ing that the rest area and the main road were to be built simultaneously."

Alteration No. 1 was finally approved by the D. P. W.'s commissioners on April 23, 1963. It bore the approval of the district highway engineer, the construction engineer and the chief engineer of the department. It recited as "Reason for Alteration: Additional borings taken by contractor give no indication of ledge, also a reappraisal of available preliminary information shows that the presence of solid ledge is doubtful." The letter of transmittal, signed by the construction engineer, stated that alteration No. 1 calls for "revising from the designated 1/4 Ledge Slope, as contracted, to the less precipitous 2/1 Earth Slope, as now warranted because of the absence of anticipated ledge; . . . and for the construction of a rest area for which there was no provision in the original design; all the above work between main baseline stations 297+50± and 307+50± and also between stations 2+50± and 8+50± N. W. Ramp at Amesbury Road . . . ." The same letter stated: "Alteration # 1 is considered to be in accordance with the applicable provisions stipulated under Article XXII of the . . . [Blue Book]." [5] The schedule annexed to the alteration shows that thirty-five items in the original contract were affected: increases in twenty-seven items and decreases in eight. A far greater number were unaffected; these were not mentioned in alteration No. 1. The item principally affected was item A2–1, roadway earth excavation, by an increase of 128,252 cubic yards at the unchanged price of fifty-six cents per cubic yard. There was no reference in alteration No. 1 or in the papers which accompanied it to item A2–2, class A rock excavation. Alteration No. 1 said nothing about simultaneous performance of the rest area work and adjacent highway work.

---

[5] "Article 22. Alteration of Work. . . . In case of any alterations, so much of the contract as is not necessarily affected by such alterations shall remain in force upon the parties thereto, and such alterations shall be made under the terms of and as a part of the contract . . . ."

## THE REST AREA CLAIM.

Simultaneous work on the rest area and roadway was a material factor in inducing State Line's agreement to do the work for the price set out in alteration No. 1. It had obvious advantages to the contractor. It would permit efficient use of equipment. Loading and hauling would be eliminated or reduced. Scraper loads of fill could be moved directly from cut areas proximate to the rest area embankment. On April 23, 1963, the D. P. W. resident engineer ordered State Line to begin work on the rest area. It was then doing work along the adjacent highway. On April 29, 1963, State Line received a "Right of Entry" notice informing it for the first time that it could not proceed with the rest area work until an easement should be obtained beyond the layout for slope and drainage. It was ordered to stop the work on the rest area. Work within the layout at that point was impracticable because the existing drainage ditch would be blocked off. The D. P. W. had done nothing about an easement and did not work out a plan for the necessary taking until July 2, 1963. The actual taking was not completed until September 3, 1963. State Line was then told to go ahead with the rest area. When this instruction was received, State Line's men and equipment were not only distant from the rest area site, but because of the work there being done (at the North West Ramp near Amesbury Road) there was no access to the rest area site along the roadbed which afforded the most direct route. The job was completed by hauling fill by truck over public ways. On September 9, 1963, State Line filed notice of claim with the D. P. W. The D. P. W. "well knew it had no easement" when it made alteration No. 1 and ordered State Line to work in the rest area, and its failure to inform State Line was "a patent act of omission." The D. P. W. did not act prudently, reasonably, wisely, properly or in a businesslike fashion. On this claim the auditor and the judge found for State Line in the sum of $19,698.

The Commonwealth does not question the amount of the award. It argues that recovery should be denied because (1) there was no valid agreement that the work on the rest area be done simultaneously and (2) the claim is essentially based on delay and therefore is barred by clause 3 of the original contract and by article 68 of the Blue Book. The issues were raised before the judge by a motion to strike parts of the auditor's report and by requests for rulings.

As noted earlier the finding of the judge in an action at law must be sustained if it can be supported upon any reasonable view of the evidence, including such rational inferences as the evidence warrants. *Charles I. Hosmer, Inc.* v. *Commonwealth*, 302 Mass. 495, 499, and cases cited. The evidence showed protracted studies, discussions and negotiations, following the execution of the original contract, by State Line and the field representatives of the D. P. W. As the discussions progressed and the plans became firm, State Line insisted to the field representatives that the rest area work be done simultaneously with the adjacent highway work. It was assured by them that it could be thus done. The written preliminary offer and estimate referring to alteration No. 1 of March 18, 1963, over the signature of the district highway engineer invited by State Line's acceptance, did not however mention simultaneous performance. The preliminary letter showed on its face that a copy of it went to the D. P. W.'s chief engineer whose authority to act for the D. P. W. in the premises is unquestioned. State Line's letter of acceptance of March 27, 1963, was expressly conditional on simultaneous performance. It may reasonably be inferred that State Line's letter of conditional acceptance was directed to the district highway engineer, the author of the preliminary letter. It is also inferable that State Line's letter of conditional acceptance proceeded through the same channels of communication in the D. P. W. headquarters, as had the communication of March 18, 1963, from the district highway engineer which showed on its face that a copy had been sent to the chief engineer. Indeed alteration No. 1, which shows on its face that it originated over the signature

of the district highway engineer, was approved successively by the D. P. W. construction engineer (who also signed the letter of transmittal to State Line), and by the chief engineer of the D. P. W. We conclude from the documents that the issuance of alteration No. 1 was an authoritative acceptance of the condition of simultaneous performance imposed in State Line's writing of March 27, 1963. The D. P. W.'s order to State Line to commence and State Line's actual commencement of work on the rest area on the day alteration No. 1 was approved, April 23, 1963, when State Line was engaged in adjacent roadway work, was confirmatory of the mutual understanding. The D. P. W.'s order on April 29 to cease work could be found to be a breach of the agreement for which the D. P. W. alone was responsible and which with reasonable foresight it could have avoided.

The Commonwealth argues that even if the cease-work order was due to the D. P. W.'s own remissness the result was merely delay for which damages may not be awarded in view of the specific provisions of the contract, citing *Wes-Julian Constr. Corp.* v. *Commonwealth*, 351 Mass. 588, 596–597. The answer to this argument is that, as to the rest area, the essence of the agreement was that there would be no delay at the particular site where the work was to be done. The correct conclusion is that there was a breach of an agreement which caused State Line to do "extra work." The auditor's unchallenged finding that State Line filed notice of claim on September 9, 1963, within one week of commencing work, warranted a finding of compliance with art. 23 of the Blue Book which specifies the requirements for compensation for "extra work."

We must mention that this phase of the litigation at the trial was resolved by the judge favorably to State Line in part by a finding that the D. P. W. personnel, noted in fn. 4, had actual authority to make a binding agreement that the work be done simultaneously. Since we have resolved the issue on other grounds, it is unnecessary to decide the issue of their authority on the record before us. We point out that it is one thing to have authority, as they doubtless have

under art. 28, for example, to order work to stop or to resume.   See *Campanella & Cardi Constr. Co.* v. *Commonwealth*, 339 Mass. 231, 237.   It is quite another matter, however, to say that they have authority to make an oral agreement under which the Commonwealth will be held to respond in damages if the contractor is instructed to stop work.   Our holding on the grounds stated is within the broad ruling of the judge "that the contract changes which are the subject of this petition were duly authorized by agents of the . . . [Commonwealth] with actual authority so to do."

There was no error in the award under claim "B."


LEDGE REMOVAL CLAIM.

After execution of alteration No. 1, and as the work progressed, State Line encountered solid ledge in excavating the North West Ramp in an area where neither the original nor the revised D. P. W. plans and boring information indicated the existence of ledge.[6]   State Line removed 82,000 cubic yards of ledge for which it was paid fifty-six cents a cubic yard.   On the basis that the fair cost was $1.25 for a cubic yard an award of $102,500 was made.[7]   The judge predicated the award in his basic rulings that the "underlying agreement" had been "destroyed by the conduct of the defendant," that the work was done "under 'new plans' and 'cross sections,' " and that the ledge was encountered in a land area where it was not "expected to be encountered under the original contract."   We construe these rulings to mean that alteration No. 1 and the revised slope plans superseded entirely the original agreement, implicitly cancelling the unit price there included for ledge removal.   We find it difficult to accept this proposition.

The Blue Book, incorporated by reference in the original contract, provides in art. 22 (quoted in part in fn. 5) that so

---

[6] The original D. P. W. plans had indicated ledge in *some* areas of the North West Ramp.

[7] This award made no allowance for the payment already made of fifty-six cents a cubic yard.

much of the original contract as is "not necessarily affected" by alterations shall remain in force. Specific reference to art. 22 was made in alteration No. 1. In addition, as noted in the preliminary statement of this opinion, responsibility for the ascertainment of quantities of materials was placed solely upon the bidder in the "Instructions to Bidders." The statement was repeated in various forms of expression in arts. 3A, 3B, and 4 of the Blue Book.

The recommendations for change which resulted in alteration No. 1 were instigated by State Line and were based mainly on the results of its own testings and those of the contractor hired by it. We cannot say that the original contract price of fifty-six cents a cubic yard for class A rock excavation was "necessarily affected" by alteration No. 1. Even though it was no longer anticipated by the parties that significant quantities of ledge would be encountered as evidenced by the redesign of the slopes, that anticipation would not necessarily exclude a unit price for the item in the event some ledge might be encountered, particularly in those areas which would not have been excavated under the original plans because of the steeper slopes.

That the boring information and plans upon which State Line might have relied in entering into the original contract or in agreeing to alteration No. 1 did not truly show the actual location and quantities of ledge which ultimately were encountered and removed does not provide any basis for the recovery by State Line of a price in excess of that which it bid for ledge removal. There is nothing in alteration No. 1 to suggest that the numerous contract and Blue Book provisions respecting the responsibility of the contractor for estimates of quantities were not to apply to the revised estimates of quantities.

We should point out, moreover, that State Line's claim for additional compensation would fail even on the assumption that a unit price no longer existed under the contract for ledge removal. In that event the ledge excavation would constitute "extra work" as defined in art. 23 of the Blue Book.

Article 23 sets forth the procedure by which the contractor can be ordered to perform "extra work."[8] The auditor did not find that the engineer had submitted a written order as required by the first paragraph. The auditor's report is also silent as to compliance by State Line with the provisions of the third paragraph respecting the filing of a statement of the details of such extra work and amount of damages. Articles 23 and 58 of the Blue Book make such compliance a prerequisite to recovery by State Line.[9]

The judge found, "as did the auditor, that proper written authorization for the work, wherever necessary, was given and that the plaintiff duly filed an itemized statement within the time required by the contract or by law.[10]

The auditor's general finding for State Line on this claim was prefaced by the words, "Based upon the above subsidiary findings of fact . . . ." This language reveals that the auditor does not purport to base his general findings on unstated findings of those subsidiary facts necessary to support his general finding. The only stated findings relative to compliance by State Line with filing and notice requirements are contained in paragraphs 25 and 150. Paragraph 25 by its context is limited to the rest area claims and para-

---

[8] "Article 23. Extra Work. The Contractor shall do any work not herein otherwise provided for when and as ordered in writing by the Engineer, such written order to contain particular reference to this article.

"If the Engineer directs, the Contractor shall submit promptly in writing to the Engineer an offer to do the required extra work on a lump sum or unit price basis, as specified by the Engineer . . . .

"If the Contractor claims compensation for extra work not ordered as aforesaid, or for any damage sustained, he shall, within one week after the beginning of such work or of the sustaining of any such damage, make a written statement to the Engineer of the nature of the work performed or damage sustained, and shall on or before the fifteenth day of the month succeeding that in which any such extra work shall have been done or any such damage shall have been sustained, file with the Engineer an itemized statement of the details and amount of such work or damage; and unless such statement shall be made as so required, his claim for compensation shall be forfeited and invalid, and he shall not be entitled to payment on account of any such work or damage . . . .

"Payment for extra work will be made in accordance with the provisions of Article 80."

[9] See fn. 11 for pertinent parts of art. 58.

[10] The judge also made reference to G. L. c. 30, §§ 39I and 39J. This reference does not add any support for his finding, and its purpose is not clear.

graph 150 is similarly limited to another specific claim not now under review. The auditor did refer to art. 58 of the Blue Book in considering the ledge removal claim, but only to state his finding that the Commonwealth was "culpable of 'an act of omission or commission' " within the provision of that article. In the absence of a pertinent and specific finding by the auditor there was no evidence to support the judge's ruling that State Line had compiled with these Blue Book provisions. The general finding of the auditor was not enough. See *Friedman* v. *Berthiaume*, 303 Mass. 159, 162–163; *Moore* v. *Worcester Insulation Co.* 338 Mass. 44, 46–47. Failure to comply with the Blue Book provisions precludes recovery by State Line on this claim. *M. DeMatteo Constr. Co.* v. *Commonwealth*, 338 Mass. 568, 587–593. *Marinucci Bros. & Co. Inc.* v. *Commonwealth*, 354 Mass. 141.


NEWTON ROAD CLAIM.

As part of the contract State Line built a bridge over Newton Road, which intersected Interstate Route 495, so that Newton Road would run under Route 495. During relocation of Newton Road, while the bridge was under construction, it was necessary to use a detour. After State Line completed the relocation it notified the D. P. W. resident engineer that the relocated road was ready for use at noontime on June 21, 1963. When the traffic division of the D. P. W. failed to put in signs, paint lines and install directional signals on the new road, the resident engineer ordered State Line to reopen the detour. State Line claimed the costs of reopening the detour as an item of damages in its petition. The auditor found the fair and reasonable value of "extra work" to be $996.62, and reported the question whether art. 58 of the Blue Book barred recovery. The judge found for State Line.

The Commonwealth challenges State Line's recovery on this claim (1) because the claim is barred by the delay provisions of cl. 3 of the original contract and art. 68 of the Blue Book, and (2) because State Line failed to comply with

the notice provisions of arts. 23 and 58 of the Blue Book.[11]

We pass over the first contention with the observation that it would be difficult to characterize the order to reopen the detour as an act causing delay. By that time State Line had completed its work under the contract. The reopening undeniably was "extra work." There was error nevertheless in the award on this claim because there was no evidence to support the judge's finding that State Line had complied with the notice provisions. The auditor's specific findings did not deal with the question, and his general findings, based as they were only on his specific findings, were not enough. *Friedman* v. *Berthiaume*, 303 Mass. 159, 162–163. *Moore* v. *Worcester Insulation Co.* 338 Mass. 44, 46–47. Failure to comply with art. 58 precludes recovery. *M. DeMatteo Constr. Co.* v. *Commonwealth*, 338 Mass. 568, 587–593. *Marinucci Bros. & Co. Inc.* v. *Commonwealth*, 354 Mass. 141.

## WASTE DISPOSAL CLAIM.

As the result of the redesign of the slopes due to the expected absence of ledge, and also as the result of other changes in the design made during the project, State Line was never required to provide any ordinary borrow as called for in the original contract. Instead, State Line had to dispose of some 204,000 cubic yards of excavated materials outside the job site. For this work, the contractor received only the unit price for roadway earth excavation, fifty-six cents a cubic yard. The auditor found that State Line had been required to haul this material an average distance of less than one mile at the rate of thirty-five cents a cubic yard, basing his price on the approved D. P. W. minimum rate for hauling of thirty-five cents for the first mile. The auditor found for State Line in the amount of

---

[11] "Article 58. Claims of Contractor . . . . All claims of the Contractor for compensation other than as provided for in the contract on account of any act of omission or commission by the . . . [D. P. W.] must be made in writing to the Engineer within one week after the beginning of any work or the sustaining of any damage . . . . Unless such statement shall be made as so required, the Contractor's claim for compensation shall be forfeited and invalid, and he shall not be entitled to payment on account of any such work or damage." See fn. 8 for text of art. 23.

State Line Contractors, Inc. *v.* Commonwealth.

$71,900, on the basis that such a large amount of disposal outside the job site could not have been contemplated under the original contract which had called for the furnishing of borrow.[12] The auditor made no finding of compliance by State Line with notice or filing requirements relative to this claim. Neither did the auditor purport to base his award on a computation of the cost of "wasting" in accordance with art. 23 or 80 of the Blue Book.[13]

The Commonwealth argues that State Line cannot recover (1) in the absence of a showing of the actual cost as required by art. 80 of the Blue Book, and (2) in the absence of a showing of compliance with arts. 23 or 58 of the Blue Book.

There was error. Under art. 80 of the Blue Book compensation for extra work must be based on the actual costs. Such a computation was not made. Also, the auditor made no finding of compliance with arts. 23 and 58. For the reasons stated in considering claims earlier reviewed compliance could not be inferred by the judge from the auditor's general findings, and the absence of compliance precludes recovery.

### EARTH EXCAVATION CLAIM.

State Line's superintendent, one Adams, an experienced surveyor, took independent measurements of the elevations throughout the entire project. His survey, which the auditor found was done accurately and in good faith, revealed discrepancies in the measurements taken by the

---

[12] This amount does not compare with the auditor's figures. Two hundred four thousand cubic yards at thirty-five cents a mile would be $71,400, an error in calculation which has gone unnoticed.

[13] "Article 80. Payment for Extra Work. Extra work will be paid for in accordance with the accepted and approved extra work order. Work specified and performed on a cost plus or force account basis will be paid for as follows: Unless an agreed price for the extra work ordered by the Engineer in accordance with Article 23 is set forth in the extra work order the Contractor shall accept as full payment therefor an amount equal to the following: (1) the actual cost for direct labor, material and use of equipment, plus 10 percent of this total for overhead; (2) plus actual cost of Workmen's Compensation and Liability Insurances, Social Security deductions, and Unemployment Compensation benefits; (3) plus 6 percent of the total of (1) and (2) for profit; (4) plus actual proportionate cost of surety bond. . . . No allowance shall be made for general superintendence and the use of small tools and manual equipment."

D. P. W. and used to determine the amount of earth excavation between highway stations 300 and 307. Adams's measurement revealed that the amount had been underestimated by the D. P. W. by 18,893 cubic yards. The auditor found for State Line on its claim for the contract price for this extra amount of earth excavation, awarding $10,580 and reporting any questions of law to the court. The judge found for State Line on this claim substituting the amount of $10,850 as the award.[14]

There was no error. This was not a claim for extra work, but was a claim for work done under the contract at the contract price. Thus, the Commonwealth's arguments addressed to the alleged noncompliance of State Line with art. 58 notice provisions are neither pertinent nor persuasive. The Commonwealth's contention that the measurements taken by the D. P. W. engineer are not open to dispute by State Line likewise fails. Article 83 of the Blue Book provides, in part, "The Engineer shall . . . make a final estimate of the amount of work done . . . [under the contract] and the value of such work, and the Department shall . . . forward to the Contractor a copy of the final estimate *together with an agreement form for his acceptance*" (emphasis supplied). This language strongly implies that the contractor has the right to challenge the accuracy of the final estimate. The Blue Book provision, art. 28, relied upon by the Commonwealth to show the "finality" of measurements taken by the engineer does not in terms address itself to the final estimate. Article 28 relates to the authority of the engineer to control the work while in progress, and the language relative to measurements relates to work to be performed. The use of the future tense in art. 28 does not suggest that the engineer's determination of quantities already performed are accorded "finality." The language in art. 77 under the Blue Book title "Measurement and Payment" bears out this analysis. There "[t]he quantities of the various items of work performed shall be

---

[14] This would appear to be a clerical error, as the auditor's award is a correct result of the calculation 18,893 cubic yards at fifty-six cents a cubic yard.

determined by the Engineer." These "measurements" will "determine the quantities . . . as the basis for final settlement." There is an absence of words similar to "final and conclusive" as used in art. 28.

There was no error in the award on this claim except for the clerical error pointed out in fn. 14. The authorities cited by the Commonwealth are distinguishable and do not require a contrary decision.

## INTEREST.

The judge found for State Line on eight paragraphs of the petition in amounts totaling $225,974.45. An item of interest on this amount from sixty-five days from December 2, 1964, when the contract was completed, to the date of finding in the amount of $37,172.70 was also awarded. The auditor made no finding respecting interest.

The Commonwealth argues that interest should have been computed from January 21, 1966, the date the petition was filed. Interest was awarded at the rates approved in *Wes-Julian Constr. Corp.* v. *Commonwealth*, 351 Mass. 588, 602. General Laws c. 30, § 39G, provides that payment on disputed items or claims can be deferred until an agreement has been reached or the claim adjudicated. The Wes-Julian award was not disputed, see footnote 351 Mass. 588, 602, and the case cannot be considered to require a different result from the express language of the statute. Thus, interest on these claims which have been allowed should run only from the date the claim was commenced, i.e., the date the petition was filed.

## SUMMARY AND ORDER.

For the reasons stated above we are of opinion that the awards to State Line under the rest area claim and the earth excavation claim, as corrected, were right. The awards based on the ledge removal claim, the Newton Road claim and the waste disposal claim were based on error of

law.    State Line's argument that the Commonwealth, having been found in breach of alteration No. 1 on the rest area claim, cannot rely on provisions of the basic contract to bar recovery on its other claims is untenable.    These provisions were included in the contract in express contemplation that the Commonwealth might, in the course of the contract, require the contractor to perform work not contemplated by the contract, or in a manner not contemplated by the contract.    That State Line may have been put to extra expense by action of the Commonwealth does not excuse State Line from complying with these provisions.

One final comment should be made.    The record as it came to us left much to be desired in form and substance. The outline bill of exceptions resembles a scrambled jigsaw puzzle.    The auditor's report, as the judge aptly commented, is "the ultimate in fragmentation."    So too would be an attempt to discuss the Commonwealth's motion to strike. The Commonwealth's requests for rulings for the most part are an incomprehensible jumble that should not be inflicted on any judge.    We have considered each claim de novo, as the nature of the evidence permits us to do.    All substantive issues have been dealt with.

No decision is required on paragraphs 10, 13 and 14 of the petition as the Commonwealth has made an offer of judgment encompassing these claims including interest and costs to the date of the offer.

Judgment shall enter for State Line for such total sum (interest being computed in accordance with this opinion) as it shall be entitled to recover on paragraphs 7, 10, 13, 14 and 16 of the petition.

*So ordered.*