EARL ALPERT, trustee in bankruptcy, *vs.* COMMONWEALTH.

Suffolk. January 8, 1970. — April 27, 1970.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Contract,* Building contract, Warranty. *Practice, Civil,* Amendment, Proceeding against Commonwealth.

In a proceeding against the Commonwealth under G. L. c. 258, an amendment of the petition adding to the original claims under a contract other claims under that contract was an "incident of ordinary practice" which was within the court's discretion to allow. [318]

Nondisclosure by the Department of Public Works to a contractor on a highway construction project of information indicating inadequate borings which the department had taken, and its "positive" representations to the contractor of the precise amount of "unsuitable" material to be excavated from the construction site, in the circumstances constituted a breach of warranty which entitled the contractor to damages from the Commonwealth where it appeared that the department's "Notice to Contractors" expressly stated that "complete information" was available, that prior to submitting his bid the contractor requested all information and was informed "that all information was contained in the plans and specifications" furnished him, that his decision to bid and the amount of his bid was based on the information given, that he actually excavated almost four hundred per cent more unsuitable material than the amount represented, and that he suffered financial loss as a result of relying on the representations made. [321]

A proceeding against the Commonwealth lies under G. L. c. 258 for breach of a warranty. [321–322]

Under a highway construction contract with the Commonwealth distinguishing between excavation from the construction site of material "suitable" or "unsuitable" for use elsewhere on the site, but providing for a unit price for all excavation which was premised on the precise amount of unsuitable material represented as present by the Department of Public Works to a contractor to enable him "to bid on the different portions of the work in accordance with . . . [his] cost," on a ratio of seventeen cubic yards of suitable material to one cubic yard of unsuitable material, and on the assumption that unsuitable material was located only in one small section of the site, it was held that the contract should be interpreted as containing readily calculable separate unit prices for the excavation of "suitable" and "unsuitable" material, and, where it appeared that the con-

tractor actually excavated from virtually the entire site almost four hundred per cent more unsuitable material than the amount represented, that he was entitled to payment for excavation of the excess unsuitable material as an extra. [325]

Where it appeared in a proceeding agianst the Commonwealth that the Department of Public Works represented to a contractor planning to bid on a highway construction contract that all the information the department possessed was contained in plans and specifications furnished the contractor and that "only" a stated amount of gravel borrow was necessary to be hauled to the job site, that in reliance on such representations the contractor purchased a nearby pit containing borrow sufficient to provide such amount, that the department greatly underestimated the amount of borrow necessary and the contractor was forced to purchase new borrow pits at a greater distance from the job site in order to supply an extraordinary amount of additional borrow, it was held that the contractor was entitled to compensation, as an extra, for hauling the additional amount of borrow, which was done "upon the orders" of the department's engineer, the extra distance from the job site which the new pits were beyond the original pit. [327]

Under a highway construction contract providing that compensation for gravel borrow "shall be determined by the actual quantity of gravel borrow used, as measured complete in place," where there was evidence in a proceeding against the Commonwealth that such method of measurement was "impracticable and inaccurate" because, through no fault of the contractor furnishing borrow, "subsidence and seepage of the soil" occurred where borrow had been placed and that the contractor was instructed by an engineer of the Department of Public Works to supply borrow in addition to the amounts specified in the contract and to take a "truckload count" of the additional borrow, the contractor was entitled to compensation for additional borrow furnished at the unit price, as borrow furnished under the contract and not as an extra [328–329]; in view of a similarity of circumstances, the contractor was also entitled to compensation for borrow placed on the slopes of the highway to replace material which he had placed there but which slid off solely because of the defective nature of the subsoil of the slopes [330].

In a proceeding against the Commonwealth, where it appeared that a highway construction contract listed town roads within the immediate area of the construction site which would be primarily affected by the contractor's vehicles and which he must repair, that a dumping site and borrow pit which he acquired to meet the job requirements were near such roads, but that the actual dumping and borrow requirements were far in excess of the requirements initially contemplated and the contractor was forced to acquire additional dumping sites and borrow pits further away, that as a result of the traffic between the construction site and the additional locations town roads not listed in the contract were severely damaged and the contractor was instructed by an engineer of the Department of Public Works to repair

them, it was held that the contractor was entitled to compensation for repairs to the damaged, unlisted roads, as an extra. [329–330]

Where it appeared in a proceeding against the Commonwealth that riprap work under a highway construction contract stating that the stones were not "required . . . [to be] especially smooth or even" had been completed with the stones not laid smooth and even, that an engineer of the Department of Public Works approved the work, that subsequently he was informed by the Federal Bureau of Roads that the riprap did not comply with Federal standards and would have to be relaid so that the stones would be smooth and even, and that the engineer ordered this done, it was held that the original riprap work was not within the "defective work" provision of the contract and that the contractor was entitled to compensation for relaying the riprap, as an extra. [331–332]

PETITION filed in the Superior Court on March 23, 1961. The case was heard by *Chmielinski*, J.

*John E. Sheehy*, Assistant Attorney General, for the Commonwealth.

*George Michaels* (*Lawrence H. Adler, Fred B. Wilcon & Ruth R. Budd* with him) for the petitioner.

SPIEGEL, J. This petition against the Commonwealth was brought under G. L. c. 258. The original petitioners were three individuals who were doing business as a partnership under the name of Golden & O'Brien (hereinafter referred to as Golden). They sought to recover damages in the sum of $11,481.36 for "extra expenses and costs" in performing a highway and bridge construction contract with the Commonwealth. Subsequently, one Earl Alpert, trustee in bankruptcy of the partnership, was substituted as petitioner. Alpert (hereinafter referred to as petitioner) on motion, was allowed to amend the petition. The amendment, in essence, alleged that Golden "performed the work . . . provided for" under the contract and that "final payment . . . has not been made" because the "amount due . . . is in dispute." Later, the petitioner, on motion, was allowed to further amend the petition by adding certain clauses stated in rather extended detail. The Commonwealth excepted to the allowance of this motion. The case was referred to an auditor whose findings of fact were not to be final. The auditor found for the petitioner on nine of his claims totaling

$485,422.61 plus "interest from the date the Commonwealth accepted the work as completed." The Commonwealth filed a motion to recommit the auditor's report and a motion to strike a certain paragraph from the report. The trial judge denied each motion subject to the Commonwealth's exceptions. At the trial, without jury, the evidence comprised the auditor's report, the testimony of witnesses and numerous exhibits. The Commonwealth filed forty-two requests for rulings of law. The judge made extensive findings and ruled on each of the requests. He found for the petitioner on seven of the nine claims in the total sum of $486,737.06 plus interest "from the date of the petition at the rate of five . . . per cent per annum." The Commonwealth excepted to a number of findings and rulings of the judge. The case is here on an outline bill of exceptions. "We disregard exceptions to the judge's findings. See *Stella* v. *Curtis*, 348 Mass. 458, 461 . . . [and] determine whether the judge's decision can be supported in law or must as matter of law be reversed." *State Line Contractors, Inc.* v. *Commonwealth*, 356 Mass. 306, 308.

We summarize the judge's findings. On May 31, 1958, the Commonwealth acting through its Department of Public Works (hereinafter referred to as D.P.W.) issued a notice to contractors requesting "[s]ealed proposals for State Highway and Bridge Construction (relocation of Route 202 . . .) in the Municipalities of Holyoke and South Hadley." Proposals on the construction had to be received by 2 P.M. on Tuesday, June 24, 1958, twenty-one working days later. "The notice also stated that '*complete information*' could be had at the office of the . . . [D.P.W.] and that 'plans [were] on display at the . . . [D.P.W.'s] [d]istrict [o]ffice in Greenfield'" (emphasis supplied). On June 4, 1958, Golden mailed the D.P.W. a check for $35 and requested information to enable it to submit a proposal. The D. P.W. responded by sending Golden "an invitation to bid which contained plans, specifications and detailed sheets including 16 pages of 'quantity sheets' containing detailed estimates of the work to be done, including estimates

as to the cubic yardage of the roadway earth excavation that would be necessary, and estimates as to how much of the excavated material to be derived therefrom would be *suitable* for use on the job site as fill and how much [material] would be *unsuitable* for such use and would have to be hauled off the job site and dumped elsewhere as waste." The quantity sheets also gave an estimated amount of the borrow[1] that would be necessary to supplement the suitable material excavated. After Golden "visited the job site insofar as it could," and relying on "the information given to it by the . . . [D.P.W.], and believing that information to be approximately correct," Golden submitted a proposal to the D.P.W.

On August 12, 1958, the D.P.W. awarded Golden the contract to construct 9,761 linear feet of State highway which was to be a minimum of eighty-five feet wide, divided by a median strip with roads on each side. The contract was duly executed and the total amount to be paid for the job was $2,828,035.20. The D.P.W. allocated $3,731,152.73 from the proceeds of a 1954 and 1956 bond issue for the relocation of Route 202. "[T]he total paid to Golden on the project was $2,998,826.75, which sum included money paid directly to Golden," including sums for extra work, and money paid "for Golden's account." The contract included the "Notice to contractors, the Proposal and Special Provisions, Standard Specifications for Highways and Bridges (the Blue Book)[2] and the plans referred to therein." The Blue Book contains provisions governing the contractual relationships between the Commonwealth and contractors.[3]

The petitioner makes nine claims for damages.

Claim One. This relates to extra work performed by Golden under Item A2–1 of the contract, "Roadway Earth

---

[1] Webster's Third New Intl. Dictionary (unabridged) defines "borrow" as follows: "[M]aterial (as earth or gravel) taken from one location (as a borrow pit) to be used for fill at another location."

[2] Article 2 of the Blue Book provides that the proposal includes, inter alia, the "detail sheets showing the preliminary estimate of quantities with information pertinent thereto."

[3] We will refer to these provisions when pertinent.

Excavation." The D.P.W. informed Golden and the other bidders that under Item A2–1 there would be 626,000 cubic yards of material to be excavated "of which only approximately 34,735 cubic yards would be 'unsuitable' material." The parties initially contemplated roadway earth excavation "in a ratio of about 17 cubic yards of suitable to one (1) cubic yard of unsuitable" and that the unsuitable material was located in the area of the northwest ramp. However, Golden, under the direction of the D.P.W.'s engineer or his representatives, removed 165,015 cubic yards of unsuitable material. This amount was 130,280 cubic yards in excess of the D.P.W.'s estimate. "Thus, Golden removed almost four hundred (400%) per cent more of that type of material than was stated would be present in the information given to Golden by the . . . [D.P.W.]." Whereas suitable material is of a granular nature, usable for "embankment purposes" and capable of being "excavated by the ordinary bulldozer and scraper method," unsuitable material is muddy and watery; excavation thereof "requires a crane, a drag-line, dump trucks, the maintenance of . . . roadways and much more labor." It is obvious that "[t]he cost of excavating, hauling and dumping 'unsuitable' material greatly exceeds the cost of so doing with suitable material." Furthermore, the contract explicitly provided that all of the unsuitable material be removed from the construction site, "while most importantly from the economic point of view, suitable materials may be utilized elsewhere on the job as fill (borrow)."

The D.P.W., even after Golden's request, failed to reveal or make available to Golden the information concerning various boring reports, boring logs, soil samples, and boring report analyses which it had previously caused to be made. The D.P.W. also "failed to apprise Golden that only seven (7) borings along the proposed roadway had been taken and that those borings were confined to about a 400 foot square area of the Northwest ramp." The borings and other tests conducted by the D.P.W. were "inadequate in number and were improperly confined to the

comparatively small area . . . in the Northwest ramp."
Good engineering practice would have required test borings
to be made along the length of the proposed roadway at
"intervals of no more than a few hundred feet."   Only in
this manner would "adequate data . . . be available for a
valid approximation of the nature of the sub-soils to be
excavated or built upon."   The twenty-one day bid period
precluded Golden from making adequate soil analyses and
test borings.  Such tests would have "taken at least 2 and ½
to 3 months," a fact known by the D.P.W.  When Golden
submitted its proposal it "was compelled to rely and did
rely reasonably . . . [as the D.P.W. knew Golden] would
rely, almost entirely, on the information it furnished Golden
as to the location and maximum amount of 'unsuitable'
material and [the belief] that it would be approximately
accurate."   The information regarding the unsuitable ma-
terial "was not merely *inaccurate*, but *grossly* understated
the actual quantity and was totally in error in confining same
to the area of . . . [the] Northwest ramp."   Had Golden
known that there were only seven borings taken on the
roadway, all in the area of the northwest ramp, it "would
not have bid the job."

The cost of excavating the 130,280 cubic yards in excess of
the D.P.W.'s estimate is to be computed in accordance with
art.   80 [4] of the Blue Book and the petitioner is entitled to
receive the sum of $290,518.55.

---

[4] Article 80, Payment for Extra Work, reads as follows:  "Extra work will
be paid for in accordance with the accepted and approved extra work order.
Work specified and performed on a cost plus or force account basis will be
paid for as follows:  Unless an agreed price for the extra work ordered by the
Engineer in accordance with Article 23 is set forth in the extra work order
the Contractor shall accept as full payment therefor an amount equal to the
following:  (1) the actual cost for direct labor, material and use of equipment,
plus 10 percent of this total for overhead;  (2) plus actual cost of Workmen's
Compensation and Liability Insurances, Social Security deductions, and Un-
employment Compensation benefits;  (3) plus 6 percent of the total of (1)
and (2) for profit;  (4) plus actual proportionate cost of surety bond.  For
work performed for the Contractor by a subcontractor, dealer, or vendor,
the Contractor shall accept as full payment therefor an amount equal to
the actual cost to the Contractor of such work or services as determined by
the Engineer, plus 10 percent of such cost.  No allowance shall be made for
general superintendence and the use of small tools and manual equipment.
The Contractor shall, when requested by the Engineer, furnish itemized

Claim Two. The petitioner seeks compensation under contract Item A6–1 for Golden's hauling 107,188 cubic yards of borrow to the job site so as to have enough fill "to make the required level of the highway." The D.P.W., by erroneously computing the amount of unsuitable material, also underestimated the amount of borrow "necessary to be hauled onto the job" to reach the proper highway level. Golden, relying on the D.P.W.'s estimate that 150,700 cubic yards of borrow would be necessary to complete the project, "arranged to procure that quantity of borrow from the 'Bemis Pit' in Holyoke, a distance of about 1.3 miles from the job site." However, when the borrow from the "Bemis" pit proved inadequate in quantity to complete the job, "Golden had to procure other pits for the necessary borrow." The nearest pits Golden "could procure" were in Granby, Massachusetts, about five miles from the construction site and approximately 3.7 miles farther from the site than the "Bemis" pit. Golden's hauling of this borrow from the Granby pits was done upon the orders of the engineer or his representatives. In accordance with the provisions of art. 80 of the Blue Book, the petitioner is entitled to payment of $37,279.98 for hauling 107,188 cubic yards of borrow an extra 3.7 miles.

Claim Three. The petitioner maintains that although under contract Item A6–2 Golden was to furnish a "specified quantity of gravel borrow," it, in fact, supplied an additional 37,497 cubic yards of gravel borrow for which the petitioner is "entitled to be paid at the contract price per unit of $1.30 per cubic yard, totalling . . . $48,746.10. Golden was instructed by the engineer or his representatives to supply the additional gravel borrow, when "[t]hrough no fault of Golden . . . subsidence and seepage of the soil" occurred "in various places on the job where gravel borrow had been

statements of the cost of the work ordered and give the Engineer access to accounts, bills and vouchers relating thereto, and unless the Contractor shall furnish such itemized statements, access to accounts, bills and vouchers, he shall not be entitled to payment for any items of extra work for which such information is desired by the Engineer. The determination of the Engineer shall be final upon all questions of the amount and value of extra work."

placed." The additional fill was necessary to bring the highway up to the required level. "The [c]ontract provided that compensation for this item 'shall be determined by the actual quantity of gravel borrow used, as measured complete in place.'" The in-place measurement method used by the D.P.W. establishes a "base line for the bottom [of the road] from which the road way was to be built up by gravel borrow to the correct grade line." However, this method of measurement assumes that the bottom soil forming the base line is reasonably stable and sufficiently dense to support the borrow placed upon it. Since the soil did not possess the above characteristics, Golden was "required to place in the excavation more gravel than was computed by the theoretical mathematics used by the . . . [D.P.W.] to determine the cubic yardage of gravel borrow placed on the roadway." The nature of the soil "rendered the base line and . . . the *in-place* measurement not only impracticable, but impossible." The base line which the D.P.W. "established was an inaccurate and unfair base line because the unstable soils beneath it allowed a seepage of the gravel down through it." Golden placed 132,400 cubic yards of gravel borrow in the excavation, 37,497 cubic yards of which were in excess of the D.P.W.'s estimate. The petitioner is entitled to receive $48,746.10 for furnishing the excess borrow.

Claim Five. The petitioner contends that he is entitled to be paid for repairing and maintaining the roads in South Hadley "which were damaged and were constantly being used in connection with the building of the highway." Because of the presence of "excessive" unsuitable material on the job site, Golden had to use heavier machinery and equipment in the excavation of the site and "heavier trucking, both in hauling the 'unsuitable' material away from the job and bringing suitable borrow onto the job." As a result of the constant traffic on the roads in South Hadley which were used "by the heavy machinery, equipment and loaded trucks, those roads were severely damaged since they were not built to withstand such use." Although this situation was not contemplated by either party when the contract

was entered into,[5] the engineer, after conferences between D.P.W.'s representatives and South Hadley town officials, instructed Golden to repair and maintain the damaged roads. Under the provisions of art. 80 of the Blue Book, the petitioner is entitled to damages in the amount of $43,790.53.

Claim Six. "The petitioner claims that Golden replaced 32,880 cubic yards of 'unsuitable' material on the slopes to the highway [contract Items A6–10 and A6–11]," and that this amount was 15,955 cubic yards "above and beyond the estimated quantity set forth in the information given to Golden by the . . . [D.P.W.]." Solely because of the defective nature of the subsoil of the embankment, "which was inept to hold the gravel borrow," the material Golden had placed on the surface of the slopes slid to the roadway during the winter. This condition, "sloughing off," was "mainly due to the great abundance of 'unsuitable' material that the . . . [D.P.W.'s] [e]ngineer . . . had ordered [to] be used in a process known as 'sandwiching.'" In this process layers of unsuitable and suitable material are alternately placed on the slope, "to avoid the use of purely suitable material and make some use of some 'unsuitable' material." The sandwiched material did not come within the various unit prices specified in the contract because of its nature and the method required to handle it. Golden objected to the "sandwiching" method "as being uneffective and a change of the original plans." At the direction of the representatives of the D.P.W.'s engineer, Golden replaced 32,880 cubic yards of sand borrow and gravel borrow. Golden was paid for 16,925 cubic yards, leaving outstanding the payment for 15,955 cubic yards. Golden was not bound by the in-place measurement provided for in the contract as the "sloughing-off in various unrelated areas of the job site and the necessary re-emplacement of additional borrow to bring the slopes back to the theoretical lines [of the in-place measurement] rendered an

---

[5] The D.P.W., in its proposal documents, originally indicated "that *no* borrow was needed for the South Hadley area, and, thus, little traffic or road maintenance was to be expected."

accurate *in-place* measurement impossible." The petitioner is entitled to recover $22,337 for the borrow deposited on the slopes and as yet unpaid for.

Claim Seven. Under contract Item C17–1, Golden was required to install riprap ("the placing of stones"). The petitioner claims that after completing the riprap work, Golden "was directed by the representative of the . . . [D.P.W.'s] [e]ngineer to re-do the rip rap work" to conform to the requirements of the Federal government. As provided in "subsection 31 of . . . [the Blue Book] . . ., '[a]ll stones shall be placed on a prepared bed or slope . . . [and] *it shall not be required that the surface be especially smooth or even.*'" Golden gave the contract for the riprap work to a subcontractor "who prepared a sample area of the rip rap . . . [which] the [r]esident [e]ngineer, as representative of the [e]ngineer, approved." The stones in the sample area were not smooth and even. "The rip rap work was completed by the subcontractor in accordance with the approval and direction of the [r]esident [e]ngineer." Thereafter, Golden and the resident engineer were informed by an inspector of the Federal Bureau of Public Roads that the riprap work did not comply with the requirements of the Federal government, in that the surface of the stones did not have a smooth and even appearance and that the work "would have to be done over." The Federal government was participating in the cost of constructing the highway and the construction was subject to inspection and approval by the Federal Bureau of Public Roads. Acting upon orders from the representative of the engineer, Golden instructed the subcontractor "to remove the rip rap as laid and to relay it so that the surfaces would be smooth and even." The subcontractor acted in accordance with the above instructions. The Federal inspector approved the riprap work and "as a result of proceedings brought by . . . [the subcontractor] against Golden and Golden's surety company," the subcontractor was paid $14,749.92 by the D.P.W. "Since the . . . [D.P.W.] altered its original specifications after the contractor completed the original rip rap work as

required, such order for change constituted work for which the contractor is entitled to be compensated." Therefore, under the provisions of art. 80 of the Blue Book, the petitioner is entitled to receive compensation in the amount of $16,224.90.

Claim Eight. This relates to the excavation and removal of the sloughed-off material involved in Claim Six. Golden, at the direction of the representatives of the D.P.W.'s engineer "did *again* excavate and remove from the roadway 15,955 cubic yards of road earth and brought the roadway back to the desired grade." The engineer obviously could not use the cross section measurement to determine the volume of the roadway excavation, but he failed to adopt an alternate method "to measure the re-excavation from the roadway" as provided for by the contract. Because of this, Golden "is entitled to be paid for what was actually excavated again to bring the roadway back to the desired grade." The amount due the petitioner under the provisions of art. 80 of the Blue Book is $27,940.

Claim Four was waived by the petitioner in open court. The judge found for the Commonwealth on Claim Nine.

## I.

The motion to amend the petition.

The Commonwealth contends that the judge erred in allowing the petitioner's second motion to amend the petition "because the amendment failed to comply with the requirements of G. L. (Ter. Ed.) c. 258, § 1." In support of this position, the Commonwealth relies on the case of *Putnam Furniture Bldg., Inc.* v. *Commonwealth*, 323 Mass. 179, where we stated, "Proceedings on petitions against the Commonwealth are not governed by . . . procedural incidents of ordinary law suits between . . . individuals which conflict with c. 258." *Id.* at 186. The *Putnam* case is readily distinguishable. There, the petitioner initially brought a petition against the Commonwealth in the Superior Court for Middlesex County. The claim involved

an amount in excess of $2,000 and the petitioner made a motion to transfer the case to Suffolk County under G. L. c. 223, § 15, "whereby in ordinary actions authority is given to the court to transfer from an erroneous venue to a correct one." However, G. L. c. 258, § 2, explicitly provides that claims in excess of $2,000 "shall be brought in Suffolk County," not transferred to that county after being initiated elsewhere. The defect in the *Putnam* case related to the jurisdiction of the court.

Further analysis of the *Putnam* case reveals that the court held that under G. L. c. 258 "only those incidents of ordinary practice, which are expressly set forth or follow by necessary implication, attach to the procedure." It seems obvious that the amendment of a petition under G. L. c. 231, § 51, is such an "incident of ordinary practice." See *State Line Contractors, Inc.* v. *Commonwealth* (involving an "amended petition under G. L. c. 258"), 356 Mass. 306. This court has long recognized that with the passage of G. L. c. 258 the Commonwealth has waived its sovereign immunity to law suits and thereby consented to have the claim against it "determined in its own courts by the same tests to which it forces its citizens to submit in the determination of their claims against each other." *Chilton Club* v. *Commonwealth*, 323 Mass. 543, 545.

The petition in the present case was originally brought to recover sums alleged to be due the petitioner on the construction contract. General Laws c. 231, § 51, gives the judge discretion to allow amendments "which may enable the petitioner to sustain the action 'for the cause for which it was intended to be brought.'" *Schertzer* v. *Somerville*, 345 Mass. 747, 750. The addition of other claims for sums due the petitioner on the contract does not change the identity of that cause of action. The motion to amend was addressed to the sound judicial discretion of the court. *Foster* v. *Shubert Holding Co.* 316 Mass. 470, 477. There was no error.

## II.

Claim One. "Roadway Earth Excavation" Item A2–1 of the Contract.

The Commonwealth puts forward five grounds for concluding that the finding for the petitioner "in the amount of $290,518.55 in Claim . . . [One] for highway earth excavation . . . was error."

A. It first asserts that "[t]here can be no recovery on the basis that the D.P.W. warranted or represented the quantity of the 'unsuitable' material."[6] We do not agree. The D.P.W.'s "Notice to Contractors" expressly stated that "[c]omplete information" was available at its office at 100 Nashua Street, Boston, and that plans were on display at its district office in Greenfield. We assume that by "[c]omplete information" the D.P.W. was referring to all the information in its possession concerning the job which was the subject of the notice. The D.P.W.'s offer of complete information in the notice imposed the correlative obligation on the D.P.W. to make available all the information it possessed on request of the contractors. Prior to submitting its bid, Golden made such a request and was informed "that all information was contained in the plans and specifications." The D.P.W. supplied Golden with detailed plans, proposals, specifications and quantity estimates of the project.

In these circumstances, Golden had every reason to believe that it was given all the information the D.P.W. possessed with regard to the conditions at the site and the amount of work (trucks, heavy equipment and labor force) that would be required to complete the construction of the highway. However, the D.P.W. had not disclosed all the information in its possession. In the preparation of its preliminary quantity sheets, the D.P.W. had directed that borings be taken and that a soil analysis be made thereof.

---

[6] The Commonwealth admits that the warranty issue to be discussed hereafter is also applicable to claims two, three and five.

The roadway to be constructed was 9,761 linear feet and good engineering practice would have required test borings to be taken along the entire length of the roadway. Yet, the test borings, only seven in number, were taken in but a four-hundred square foot area of the northwest ramp. The D.P.W. then used these borings to estimate that there would be only 34,735 cubic yards of "unsuitable" material at the entire job site when in fact there was 165,015 cubic yards of such material. Golden was not informed of the boring samples, the boring report analyses, the analyses of the soil samples, the method of the boring, nor of the limited area from which the borings were taken. At the trial one Paul T. Golden, a partner in Golden, testified that if he had been apprised of the method the D.P.W. used to estimate the amount of unsuitable material at the site, he would not have bid on the job. It is readily apparent that the D.P.W.'s failure to disclose the boring information affected not only Golden's ultimate decision to bid on the contract, but the amount of that bid.

It is well established that where one party furnishes plans and specifications for a contractor to follow in a construction job, and the contractor in good faith relies thereon, the party furnishing such plans impliedly warrants their sufficiency for the purpose intended. *M. L. Shalloo, Inc.* v. *Ricciardi & Sons Constr. Inc.* 348 Mass. 682, 687–688. *Hollerbach* v. *United States,* 233 U. S. 165, 169–172. *Christie* v. *United States,* 237 U. S. 234, 239–242. *United States* v. *Spearin,* 248 U. S. 132. *Faber* v. *New York,* 222 N. Y. 255, 259–261. In the instant case, the D.P.W. withheld information regarding borings it had caused to be taken. It made a "positive" representation as to the amount of "unsuitable" material that Golden could expect to encounter on the job site. The Commonwealth thereby impliedly warranted that it had made a full disclosure. *Christie* v. *United States, supra,* at 239–242. *Hersey Gravel Co.* v. *State Highway Dept.* 305 Mich. 333, 341. Golden relied on these representations and as a result of such reliance suffered grave financial loss.

If the D.P.W. had actually intended to leave the determination of the amount of unsuitable material open to the independent investigation of Golden,[7] it could easily have omitted the specification from the preliminary quantity sheets. In "positively" asserting the specific quantity of 34,735 cubic yards of unsuitable material, the D.P.W. "made a representation upon which . . . [Golden] had a right to rely" without further investigation and irrespective of the general language of several exculpatory clauses in the contract. *Hollerbach* v. *United States*, 233 U. S. 165, 172. *Hersey Gravel Co.* v. *State Highway Dept. supra*, 340. *Faber* v. *New York*, 222 N. Y. 255, 260. *Jackson* v. *State*, 210 App. Div. (N. Y.) 115, 119. Golden did, in fact attempt to make an independent investigation of the site, but because of the lack of time [8] between the notice to bidders and the date bids had to be submitted, it was impossible for Golden to take adequate borings. We are of opinion that the D.P.W.'s nondisclosure of the boring information and its positive representations regarding the amount of unsuitable material at the site constitute a breach of warranty for which Golden is entitled to recover damages. See *E. H. Morrill Co.* v. *California*, 65 Cal. 2d 787.

B. The Commonwealth argues that the petitioner cannot recover if he was awarded damages "based on deceit or fraud or on the theory of a negligent representation," since such suits sound in tort for which there may be no recovery under G. L. c. 258." *Benjamin Foster Co.* v. *Commonwealth*, 318 Mass. 190, 192. However, it is well settled that a warranty action sounds in contract and clearly comports

---

[7] Article 4, Examination of Plans and the Location, reads as follows: "Statements as to the condition under which the work is to be performed, including plans, surveys, measurements, dimensions, calculations, estimates, borings, etc., are made solely to furnish a basis for comparison of bids, and the Party of the First Part [the Commonwealth] does not guarantee or represent that they are even approximately correct. The Contractor must satisfy himself by his own investigation and research regarding all conditions affecting the work to be done and labor and material needed, and make his bid in sole reliance thereon."

[8] There was sufficient evidence to support the judge's findings that it would take "at least 2 and ½ to 3 months" to conduct adequate test borings and soil analyses.

with the requirement of G. L. c. 258. See *Stan Cross Buick, Inc.* v. *Concord Auto Auction, Inc.* 350 Mass. 14.

C. The Commonwealth next contends that the petitioner should not have been awarded the $290,518.55 for the excavation of the 130,280 cubic yards of unsuitable material in excess of the D.P.W.'s estimate because "[t]he evidence does not support the . . . [judge's] conclusion that Item A2–1 was a combined unit price bid based upon different unit prices for 'suitable' and 'unsuitable' material." It asserts that "under a proper interpretation of this contract" the unit price for Item A2–1 could not be changed from "38 cents per cubic yard to $1.76 per cubic yard for 165,015 cubic yards of the 'unsuitable' material excavated."

Item A2–1 of the Special Provisions entitled "Roadway Earth Excavation" provided that, "The work to be done hereunder consists of removing and disposing of materials conforming to those described in Subsections A2–10 and A2–11 . . . ."[9]

---

[9] A2.10, General, reads as follows: "The removal and satisfactory disposal of all materials encountered within the limits of the location and slopes, side roads and driveways necessary for the construction of any part of the proposed work shall be included in some classification of roadway excavation; except excavation necessary for the construction of bridges, drainage structures and installations, masonry walls, curbing and edging, traffic signal ducts, bounds and for other work as hereinafter specified. Any excavation for which payment is not otherwise provided in these specifications shall be included in one of the items of roadway excavation." A2.11, Roadway Earth Excavation, reads as follows: "Roadway earth excavation shall include the following: A. The removal and satisfactory disposal of materials such as clay, sand, gravel, loam, decomposed rock and boulders of less than one cubic yard encountered in roadway excavation as described above in Section A2.10. B. The removal and satisfactory disposal of the present balance and dry stone masonry walls and of all old guard rail and fences which are designated by the Engineer to be removed and which are not covered by an item in the proposal. C. Stripping layers of unsuitable top soil materials to a depth as directed between the outside limits of the proposed shoulders, wherever the grade of the new surface is less than three feet above the existing ground, when such excavation is indicated on the plans and/or ordered by the Engineer and when payment for same is not otherwise provided under an item in the proposal. D. The breaking up of the surface of slopes when necessary by trenching, furrowing, or otherwise before new embankments are placed thereon. E. Excavation for ditches included within the limits of the roadway slopes. F. The removal and disposal, as directed, of materials removed under the items of Class A or Class B Trench Excavation but not required for back fill when such removal requires rehandling of the materials. G. Any excavation not otherwise classified in these specifications and any class of excavation not listed in the proposal. H. The grading, rolling and

"The work shall also include the removal and satisfactory disposal of topsoil, peat, peaty sand and other soft compressible surface materials," except as otherwise provided. "The Contractor will be required to follow particular procedures in constructing the deep cut section at the Northwest Ramp . . . as directed by the Engineer."

In § A2.30 (B) of the Blue Book entitled, "Disposal of Excavated Materials," it is stated: "All suitable materials obtained from the excavation . . . shall be used either in the formation of embankments, subgrade, shoulders, slopes, loam or clay hardening, etc., or for backfill under, over, or around structures, pipe culverts or drains and such at other places as directed . . . . If the excavated material is not needed or suitable for these purposes . . . it shall be disposed by the Contractor at his own responsibility outside of the location . . . ."

In the Blue Book, art. 3 (B) provided that "[t]he excavation, masonry and other parts of the work have been divided into classes and *items* in order to enable the bidder to bid on the different portions of the work in accordance with his estimate of their cost, so that in the event of an increase or a decrease in the quantities of any particular class of work the actual quantities executed may be paid for at the price bid for that particular class of work" (emphasis supplied).

Article 22 of the Blue Book stated, "Should it be found desirable by the Engineer to make alterations in the form or character of any . . . work done . . . [he] may order such alteration to be made . . . provided that in case such alterations increase the cost of the work the Contractor shall be remunerated at prices based on prices allowed on the same character of work under the specifications . . . ."

Golden computed its cost estimate of thirty eight cents a cubic yard "for Roadway Earth Excavation" averaging

finishing of slopes, as specified in Section A–12. I. If the condition of the bottom of the excavation is wet or spongy or unsatisfactory, the Contractor may be required to excavate deeper and fill this space with clean gravel or other satisfactory material. This excavation will be classed as Roadway Earth Excavation."

the cost of "$2.00 per cu. yd. for 35,000 cu. yds. of unsuitable material and 591,000 cu. yds. of acceptable material at 29¢ per cu. yd." This computation was based on the quantity estimates that the D.P.W. initially furnished the bidders *as part of the Proposal.* We must now decide whether, in these circumstances and after considering the foregoing provisions of the contract, the Commonwealth can bind the petitioner to a unit price for all "Roadway Earth Excavation."

Although the contract provided for a unit price for all "Roadway Earth Excavation," we note that this price was premised on figures furnished Golden by the D.P.W. "to enable . . . [Golden] to bid on the different portions of the work in accordance with . . . [its] cost." Both Golden and the D.P.W. anticipated that seventeen cubic yards of suitable material would be excavated for every one cubic yard of unsuitable material that was excavated.[10] The D.P.W.'s preliminary estimate sheets and other information given to Golden and the other bidders also "indicated that all the unsuitable material was in the northwest ramp of . . . [the] job." Golden actually excavated and disposed of "165,015 cubic yards of 'unsuitable' material" from virtually the entire construction area. This was "almost four hundred (400%) per cent more" than the D.P.W. had represented.

We agree with the judge that the inclusion of art. 3 (B) in the Blue Book evidences the Commonwealth's intent "that the contract be interpreted fairly where the types of excavation are of substantially different costs and quantity." Even assuming that the excavation of "unsuitable material" is not a class of work under art. 3 (B), we think it is clear from the quantity sheets furnished by the D.P.W. and § A2.30 (B) of the Blue Book that this contract distinguished between the excavation of "suitable" and "unsuitable" material. It seems to us that the single unit price for "Road-

---

[10] On this basis there would be 590,357 cubic yards of suitable materia and only 34,735 cubic yards of unsuitable material.

way Earth Excavation" was necessarily calculated on the assumption that the earth excavation would occur in the ratio indicated in the plans. The parties certainly did not contemplate that the unit price for "Roadway Earth Excavation" would encompass the excavation and disposal of such a large quantity of unsuitable material. It is reasonable to conclude that if the parties had foreseen the above situation, they would have provided for separate unit prices for the excavation of the two types of material.

We are of opinion that the contract must be fairly interpreted as containing separate unit prices for the excavation of "suitable" and "unsuitable" material which can be readily calculable. The determination of the engineer is not final as to "the amount and value of extra work" as is provided in art. 80 of the Blue Book since his determination was based on a unit price of thirty-eight cents for all roadway excavation. We are satisfied that the judge's calculations conform to the method for determining "Payment for Extra Work" as prescribed by art. 80 of the Blue Book. Point 2 in *Wes-Julian Constr. Corp.* v. *Commonwealth*, 351 Mass. 588, 599–601. The Commonwealth relies on the case of *Wes-Julian Constr. Corp.* v. *Commonwealth, supra*, at 601–602 (point 3). The situations, however, are clearly different. In the *Wes-Julian* case, we held that the changes in the excavation requirements and the resultant cost increase in the excavation of certain materials was not, in and of itself, a sufficient basis for exempting that type of excavation from the unit price as provided in the contract. In that case, as distinguished from the case at bar, we were unable to "say that separate unit prices were contemplated." *Id.* at 602.

D. In view of our determination that the petitioner could recover damages on the theory of an implied warranty, we need not treat with the Commonwealth's argument that there was insufficient evidence to support the judge's finding that the "failure of the [e]ngineer to make any allowance on this claim [o]ne was a gross error implying a failure to exercise honest judgment . . . as to be tantamount to fraud."

E. We discern no basis for the Commonwealth's conten-

tion that "[t]here is no basis in the evidence to support the Court's finding of compliance within the time specified in the Blue Book for filing claims." From our review of the record we are satisfied that the evidence was sufficient to support the judge's finding.

## III.

Claim Two. Overhaul of Gravel Borrow Item A6-1 of the Contract.

The Commonwealth argues that the judge erred in "imposing an overhaul allowance for ordinary borrow, Item A6-1," since Golden had been paid for 257,888 cubic yards of borrow at the contract price of eighty cents a cubic yard. We do not agree.

The Commonwealth's proposal contained a representation by the D.P.W. that "only 150,700 cubic yards of borrow were necessary to be hauled onto the job to make the required level of the highway, when in fact, 257,888 cubic yards" were hauled onto the site.[11] This amount was 107,188 cubic yards in excess of the D.P.W.'s estimate. Golden had initially purchased the "Bemis" pit in Holyoke, which was located about 1.3 miles from the job site. This pit contained sufficient borrow to provide the 150,788 cubic yards that the D.P.W. had estimated would complete the job. The increased demand for borrow, resulting from the D.P.W.'s underestimation, forced Golden to purchase new borrow pits in Granby, which were located approximately 3.7 miles farther from the site than the "Bemis" pit. It is clear to us that Golden relied on the D.P.W.'s representation of borrow requirements in acquiring the "Bemis" pit. Such reliance was founded on the D.P.W.'s representation that all the information it possessed was contained in the plans and specifications. The theory of warranty as a basis for the recovery of damages, set forth in Claim One, is equally applicable to the instant claim.

---

[11] The extra amount of gravel borrow that had to be hauled to the site was the result of the D.P.W.'s underestimation of the amount of unsuitable material that would be found.

As in Claim One, we believe that Golden was warranted in computing its unit price for ordinary borrow on the assumption that it would need to haul only the amount that the D.P.W. represented would be necessary to complete the job. Its calculation of that figure was based on the prospect of hauling 150,700 cubic yards of borrow a distance of 1.3 miles from the "Bemis" pit to the job site. It seems plain that it was not contemplated that Golden would have to purchase additional borrow pits and supply 107,188 cubic yards of additional borrow to the site. The additional borrow required to complete the job was seventy-one percent of the D.P.W.'s initial estimate of ordinary borrow required. It is certainly reasonable to conclude that had Golden been aware of the vast discrepancy between the actual and projected amounts of ordinary borrow necessary to complete the job, its unit price for such borrow would have reflected the extra cost which necessarily would be incurred in hauling the borrow from pits other than the "Bemis" pit. Since the Commonwealth's resident engineer computed the payment for hauling the additional borrow on the unit price submitted by Golden, in reliance on the D.P.W.'s representation of borrow amounts, we are of opinion that Golden was entitled to be compensated for hauling the additional borrow a distance greater than that originally contemplated. Because of the extraordinary amount of additional borrow required, we think that the hauling thereof, which was done "upon the orders of the [e]ngineer," was in the nature of extra work which was not contemplated by the parties and for which the petitioner is entitled to adequate compensation. There was evidence sufficient to support the judge's finding that "Golden . . . complied with the terms of the contract, including without limitation, those concerning the claims for the payment of the additional money."[12] *Charles I. Hosmer, Inc.* v. *Commonwealth*, 302 Mass. 495, 499–500. We perceive no

---

[12] Although we are not obliged to treat with this issue, in the interest of fully disposing of the case on the merits, we choose to discuss it.

error in the judge's computation of the sum awarded the petitioner under art. 80.[13]

## IV.

Claim Three. Supplying Extra Gravel Borrow Item A6–2 of the Contract.

The Commonwealth maintains there was error in awarding the petitioner $48,746.10 for the 34,497 cubic yards of extra gravel borrow supplied because there was no evidence on which the court could "base a finding that the resident engineer ordered a 'truck count' on this item or a finding that the 'in place' measurement was 'impracticable and inaccurate.'" We disagree.

Paul T. Golden, a partner in Golden, testified that in "September or October of 1958," he had been instructed by one Hubbard, then the resident engineer, "to keep a daily load count of all gravel brought to the job." He stated that "early in the job both the Commonwealth and . . . [he] realized that due to subsidence,[14] . . . [there would be] a tremendous overrun on gravel." A complete tally of gravel truckloads was forwarded to the resident engineer.

One Frederick Panzer, who became resident engineer in June, 1959, testified that there was subsidence at the site due to unstable subsoil. He stated that "[e]arly in the job" he took "truckload counts" because a proper "in-place" measurement could not be taken. Later, when Panzer took in-place measurement of the gravel borrow,

---

[13] Cost of trucking (D.P.W. rates)    $.08   a cubic yard a mile
     10% overhead                     .008
     6% profit                            .005
     1% bond                             .001
                                       ————
                       $.094 a cubic yard a mile

107,188 cubic yards excess borrow hauled x $.094, dollars a mile a cubic yard = $10,075.67 (cost of hauling extra borrow one mile) x 3.7 miles (extra distance hauled) = $37,279.98.

[14] Webster's Third New Intl. Dictionary (unabridged) defines "subsidence" as follows: "a falling, lowering, or flattening out." That which falls or subsides, "as a sediment in a liquid."

he did not consider the subsidence although admitting that subsidence would result in an improper in-place measurement and that in all probability there would be seepage of a substantial amount of gravel borrow below the base line used in the measurement. Panzer also stated that he received tallies of the truckloads of gravel borrow hauled onto the job and that he neither asked why he was receiving the tallies nor did he tell Golden it was not necessary to submit them.

We are of opinion that there was sufficient evidence for the judge to conclude that Golden had been instructed to take a "truckload count" [15] of the gravel borrow.[16]

Contrary to the Commonwealth's contention, art. 23 of the Blue Book is not applicable. The claim is not one for extra work, but for work done but not paid for. *State Line Contractors, Inc.* v. *Commonwealth*, 356 Mass. 306, 322.

## V.

### Claim Five. Repair of Town Roads of South Hadley.

The Commonwealth contends that the petitioner "is not entitled to an additional $43,790.53 . . . for repair of roads due to increased use of the highways." It argues that "[t]he contract provided that payment for repair of roads was included under unit prices for which Golden has been paid."

In the Special Provisions, it appears that the Commonwealth listed those roads which would be primarily affected

---

[15] Panzer testified that truckload counts would have "served a purpose" early in the job "with the first resident or the original resident" engineer.

[16] A6.40, Method of Measurement, reads as follows: "All borrow (with the exception of loam borrow, peat borrow, and sand borrow for filling voids in base course) will be measured in its original position after stripping by the cross section method, except that where this method is impracticable and the Engineer so directs, such borrow (except gravel used for sub-base, gravel surfacing or backfill for structures) will be paid for as measured in place plus 15%: gravel borrow used in sub-base, gravel surfacing or backfill for structures will be paid for as measured in place plus 20%. Sand Borrow for filling voids in crushed stone base course will be measured according to the requirements of Subsection B2.40. Loam Borrow will be measured according to the requirements of Section H–1. Peat Borrow will be measured as specified in Section H–2. No overhaul allowances will be made for gravel or any other kind of borrow, or for gravel used for surfacing."

during the construction of the highway. The roads were all within the area of the site and readily accessible to travel to and from the dumping and borrow area which Golden acquired in order to meet the job requirements. We believe that Golden had a right to rely on these specifications. However, the actual scope of the dumping and borrow requirements was far in excess of that initially contemplated. Because of this Golden was forced to acquire additional dumping sites in South Hadley and borrow pits in Granby. As a result of the traffic between the site and these additional locations, public roads in South Hadley, other than those in the immediate area of the construction, were damaged. Golden was instructed to repair these roads although not called for in the listings in the contract.

Admittedly, the Special Provisions provide for "Repair of Roads." But this provision certainly did not include the repair of roads not originally contemplated to be involved in the construction job. In these circumstances, we are of opinion that the repair to roads not referred to in the contract is extra work. The petitioner is entitled to compensation in accordance with the provisions of art. 80 of the Blue Book.[17]

## VI.

Claim Six. Replacement of Suitable for Unsuitable Material Items A6–10 and A6–11 of the Contract.

The Commonwealth asserts that "[t]he court erred in finding that . . . [the petitioner] was entitled to a 'truck count' and not the specified 'in place' measurement" used by the resident engineer. We do not agree. Our discussion regarding Claim Three is equally applicable to this claim and does not require elaboration. The petitioner is entitled to recover.

---

[17] "Computed under the formula of Article 80 of the Specifications Golden is entitled to Thirty-Four Thousand Four Hundred Eleven Dollars and Three Cents ($34,411.03) for labor and equipment and Nine Thousand Three Hundred and Seventy-Nine Dollars and Fifty Cents ($9,379.50) for 7,215 cubic yards of gravel borrow at the contract unit price of $1.30 per cubic yard."

## VII.

Claim Seven.   Replacement of Riprap — Item C17–1 of the Contract.

We discern no basis for the Commonwealth's contention that the court erred in "finding for Golden . . . for redoing the rip rap."

Article 49 of the Blue Book states: "Attention is directed to the provisions of the Federal Highway Act of November 9, 1921 (42 U. S. Statute at large, page 212) as modified and as extended, under which the United States shall aid the individual states in the construction of highways.   When the United States Government is to pay any portion of the cost of the project the *above act of Congress provides that the construction work and labor in each State shall be done in accordance with the laws of that state* and under the direct supervision of its Department of Public Works subject to the inspection and approval of the Federal Bureau of Public Roads in accordance with the rules and regulations made pursuant thereto.   The work embraced in this contract will therefor be subject to such inspection by the Federal Bureau of Public Roads as may be necessary to meet the above requirements.   *Such inspection* shall, however, in no sense make the United States Government a party to this contract, *and will in no way interfere with the rights of either party hereunder*" (emphasis supplied).

Article 37 of the Blue Book entitled "Removal of Defective or Unauthorized Work" provides: "All defective work shall be removed repaired or made good notwithstanding that such work has previously been inspected and approved or estimated for payment.   If the work or any part thereof shall be found defective at any time before the final acceptance of the whole work, the Contractor shall at his own expense make good such defect in a satisfactory manner."

The riprap work was completed by a subcontractor in accordance with the provisions of § C17.31 of the Blue Book which provided that stones used in such work *"will*

*not be required . . . [to be] especially smooth or even"* (emphasis supplied). The resident engineer or his representative approved the work. An inspector of the Federal Bureau of Roads subsequently informed the resident engineer and Golden that the riprap work did not satisfy the standards of the Federal government which required that the stones "have a smooth and even appearance." At the direction of the resident engineer Golden instructed the subcontractor "to remove the rip rap as laid and to relay it so that the surfaces would be smooth and even."

The Commonwealth's reliance on the controlling effect of art. 37 of the Blue Book is ill founded. That provision of the contract must be read in conjunction with other relevant provisions. The riprap work was originally completed and approved as being "in accordance with the laws" of the Commonwealth as specified by § C17.31 of the Blue Book. The fact that an inspector of the Bureau of Public Roads found that the riprap did not satisfy the Federal requirements, *"in no way interfere[s] with the rights of either party"* and does not make the work defective as contemplated under art. 37 (emphasis supplied). Hence, the relaying of riprap, as ordered by the engineer was in the nature of extra work for which the petitioner is entitled to be compensated. We are satisfied that the sum awarded the petitioner on the instant claim was computed in accordance with art. 80 of the Blue Book.[18]

## VIII.

Claim Eight. Excavation of Sloughed Off Material.

The Commonwealth argues that the petitioner "is not entitled to $27,940 for re-excavation of the material sloughed off the embankment slopes." We do not agree.

---

[18] Under G. L. c. 30, § 39F, the Commonwealth's obligation to the general contractor is discharged only "to the extent of such payment" that the Commonwealth pays directly to the subcontractor. The evidence shows that the subcontractor was only paid for doing the work set forth in the contract. He was not paid for redoing the riprap work as required by the Federal Inspector of Roads. Therefore, under art. 80 the petitioner is entitled to recover.

We are of opinion that the legal principle applicable to this claim is governed by our discussion of Claim One and requires no further elaboration. There was no error.

## IX.

The Commonwealth's requests are lengthy and almost incomprehensible. There is no point in stating them. "We have considered each claim de novo, as the nature of the evidence permits us to do. All substantive issues have been dealt with." *State Line Contractors, Inc.* v. *Commonwealth,* 356 Mass. 306, 324.

*Exceptions overruled.*