**BROWN BROTHERS, INC.,**
**Plaintiff/Appellant,**

v.

**The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Tennessee, Defendant/Appellee.**

Court of Appeals of Tennessee, Middle Section at Nashville.

Dec. 30, 1993.

Permission to Appeal Denied by Supreme Court May 16, 1994.

Gregory L. Cashion and Lawrence B. Hammet, II, Manier, Herod, Hollabaugh & Smith, Nashville, for plaintiff/appellant.

James L. Murphy, III, Director of Law, The Dept. of Law of the Metropolitan Government of Nashville and Davidson County, Erika Geetter and Stephen O. Nunn, Metropolitan Attys., Nashville, for defendant/appellee.

### *OPINION*

CANTRELL, Judge.

This is a dispute over losses due to the amount of subsurface rock encountered in a roadbuilding contract, and to construction delays caused by relocating the utilities. The contractor, Brown Brothers, Inc., alleges that the Metropolitan Government of Nashville and Davidson County (Metro) warranted its estimates of the amount of rock to be removed, and that it is also responsible for the delays in relocating the utilities. The Chancery Court of Davidson County granted sum-

mary judgment to Metro. For the reasons set out below we affirm the chancellor's decision.

## I

Metro advertised for bids on a contract to extend Bell Road about 3.3 miles, from Smith Springs Road to a point 700 feet beyond Elm Hill Pike. The work required under the contract included clearing and grubbing, excavation, aggregate base construction, asphalt course paving, installation of a storm sewer system, installation of guardrails, and seeding and sodding. The appellant's winning bid on the contract was $2,653,255.16.

The figures the appellant relied upon in preparing that portion of its bid that relates to excavation are contained in a table on Plan Sheet 2–H. The table is labeled "Estimated Earthwork Quantities," and includes a breakdown of various types of excavation required for each section of the proposed road. The totals at the bottom of the table show 139,845 cubic yards of rock excavation and 185,184 cubic yards of what is labelled "unclassified excavation." Metro apparently concedes that as used in this table "unclassified excavation" can fairly be interpreted to mean dirt excavation.

Brown Brothers alleges that it actually had to remove over 250,000 cubic yards of rock, far more than was predicted by the estimates. At the same time, the amount of dirt that had to be removed, 67,000 yards, was far less than Brown Brothers expected. In preparing its bid, Brown Brothers calculated its total excavation costs by multiplying the rates of $3.70 per cubic yard of rock and $1.10 per cubic yard of unclassified material by the respective quantities of each on the estimate sheet. The disparity between the quantity of rock listed on the estimate sheet and the quantity actually encountered allegedly resulted in a cost overrun for Brown Brothers of $281,541.

The suit by Brown Brothers alleged that Metro Government had breached an implied warranty of accuracy by underestimating the amount of rock to be removed, with the result that the contractor was undercompensated for work it performed. Metro argued that the figures on Plan Sheet 2–H were only

provided for the convenience of the contractor, to be used solely at its discretion. The contract apparently disclaims any warranty for accuracy of its estimates by warning bidders that they "shall rely exclusively upon their own estimates, investigation and other data which are necessary for full and complete information upon which the proposal may be based." In granting summary judgment to Metro, the chancellor found that Plan Sheet 2–H did not constitute a warranty as to subsurface conditions.

## II

Rule 56 of the Tennessee Rules of Civil Procedure deals with summary judgment. Rule 56.03 provides that:

"the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

■ The chancellor found, and the appellant does not here dispute, that there is no genuine issue as to any material fact in this case. The appellant rather contends that Tennessee should adopt the so-called "Spearin Doctrine," which under certain circumstances shifts the risk of unforeseen difficulties from the contractor to the owner. It is the appellant's contention that adoption of that doctrine would render Metro liable to Brown Brothers for losses resulting from Metro's underestimate of the amount of rock to be removed under the roadbuilding contract.

The appellant has marshalled a formidable body of law in support of its argument, including opinions of the United States Supreme Court and other federal courts, and of state courts in Massachusetts, New York, California, Michigan and New Mexico. We are unpersuaded, however, that the Spearin Doctrine is as broad as the appellant represents it to be, or that it is applicable to the facts of this case.

In the case of *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166

(1918), the Supreme Court stated the general contract rule for allocation of risk: "Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered." *Spearin* at 136, 39 S.Ct. at 61. While this general rule may appear to be one-sided, the courts of many states, including Tennessee, have recognized that it is not:

"... contracting is a risk business. On some jobs contractors are able to make large profits. On others their losses are of the same magnitude. In those latter instances they are bound by contracts which inure to the benefit of owners just as we believe the state as owner was bound to the express terms of a contract which in this case inured to the benefit of the contractor" *Purcell Enterprises v. State* 631 S.W.2d 401 (Tenn.App.1981).

### III

To understand the exception that the United States Supreme Court has grafted onto the general rule, it is necessary to examine the facts of the *Spearin* case. The case arose out of the construction of a drydock at the Brooklyn Navy Yard. Mr. Spearin's contract with the Department of the Navy included a provision for relocation of a six foot sewer that ran through the planned drydock area. The Navy supplied plans and specifications for the new brick sewer, which Spearin built in accordance with those plans. The sewer was inspected by the government and accepted as satisfactory.

One year after construction of the sewer, a heavy downpour occurred, and the sewer burst, flooding the drydock area. Spearin refused to continue work until the United States Government agreed to be responsible for the damage that had occurred to the drydock, and for any subsequent damage that might occur as a result of the condition of the sewers. After fifteen months of inconclusive negotiations, the Navy annulled the contract and took over possession of the drydock site. Spearin brought suit in the Court of Claims for his losses under the contract.

Investigation revealed that unknown to the government or to Spearin, there was a dam in a seven foot sewer connecting to the relocated sewer. The dam diverted all the water from the larger sewer to the six foot sewer, causing it to burst from internal pressure. The government asserted the general proposition that risks arising from unforeseen difficulties should properly fall upon the shoulders of the contractor, but the court found that under the circumstances of this case, it was appropriate to hold the government liable for the damage to the drydock.

The Supreme Court affirmed the decision of the Court of Claims. The appellant argues that *Spearin* stands for the proposition that in supplying information for the use of a contractor, whether that information is in the form of estimates, specifications or plans, the owner creates a general warranty of the accuracy of that information. But the Court does not mention estimates, and its holding in *Spearin* is much narrower than the appellant represents: "... if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166. The court found only that the government warranted that if the specifications it supplied were complied with, the sewer would be adequate for the purposes for which it was constructed.

Subsequent cases in state and federal courts, some citing *Spearin* and some not, have identified other situations where liability for unforeseen circumstances has been removed from the shoulders of a contractor because of faulty information which the contractor relied upon to its detriment. See *Chris Berg v. United States*, 186 Ct.Cl. 389, 404 F.2d 364 (1968). *McGovney & McKee v. City of Berea*, 448 F.Supp. 1049 (E.D.KY 1978). *Broyles v. Brown Engineering Company*, 275 Ala. 35, 151 So.2d 767 (1963). However, we do not feel that any of the cited cases stands for the proposition that an owner is liable for any and all losses resulting from the use of its estimates by a contractor.

Such a broad reversal of the general rule would have particularly unsettling effects in contracts involving excavation, because by

their nature, subsurface conditions can never be determined with absolute certainty. The usual technique for predicting subsurface conditions involves sampling of the area to be excavated, using test borings and soil analyses. Such sampling is expensive and time-consuming. *L.J. McNulty Inc. v. Village of Newport,* 290 Minn. 117, 187 N.W.2d 616 (1971), *McKee v. City of Atlanta,* 414 F.Supp. 957 (1976)

Although many contracts, including the one before us, specifically disclaim any guarantee that the estimates furnished will prove accurate, and invite the bidder to make his own investigation, it would not be practical or efficient to expect each bidder to commission its own study of subsurface conditions. The bidding process, therefore, usually requires that the owner bear the expense of investigation. The question before this court is whether in supplying the results of its investigation to bidders in the form of an estimate, the owner takes on the additional burden of guaranteeing its accuracy.

## IV

In response to a request by this court for cases that demonstrate the legal effect of an estimate, the appellant cites *Alpert v. Commonwealth,* 357 Mass. 306, 258 N.E.2d 755 (1970) and *Western States Mechanical Contractors, Inc. v. Sandia Corporation,* 110 N.M. 676, 798 P.2d 1062 (App.1990). The appellant contends that these cases stand for the proposition that an estimate is a positive representation whose accuracy the owner warrants. But the present case is easily distinguished from the ones cited, in that it is based only on breach of an alleged warranty of accuracy, while the cited cases are both grounded in negligent misrepresentation.

The case of *Alpert v. Commonwealth,* 357 Mass. 306, 258 N.E.2d 755 (1970), involved a Massachusetts state highway contract. As in the case before us, substantial cost overruns occurred when the contractor found that subsurface conditions were not as represented by the governmental defendant. The court found the Commonwealth liable for the losses the contractor suffered, not because its estimates were inaccurate, but because the defendant failed to disclose that it only made

seven borings to evaluate the subsurface and that all were taken from a 400 square foot area at one end of a 9,761 foot roadway, an inherently inadequate and unreliable method of arriving at an accurate figure.

The case of *Western States Mechanical Contractors, Inc. v. Sandia Corporation,* 110 N.M. 676, 798 P.2d 1062 (App.1990) involved construction of a small arms firing range on an Air Force base. When the defendant's test borings disclosed a far greater quantity of rock to be excavated than the 2,400 cubic yards provided for in preliminary specifications, the plan was altered and the site moved to avoid the rocky area. The consulting engineer recommended additional test borings, but these were never done. In order to complete the project, the plaintiff had to excavate over 15,000 cubic yards of rock, more than six times as much as was called for in the plans. The trial court issued a directed verdict for the defendant. The appeals court reversed because it determined that a jury could have found that the defendant was negligent in not exercising reasonable care or competence in arriving at the rock estimate.

Unlike the situation in *Alpert* and *Western States,* nothing in the record of the present case indicates that the inaccuracy of the defendant's estimates constitutes negligence or misrepresentation. There is no suggestion in the record that the test borings were incorrectly done, or that the sampling methods were biased. Bidders were invited to examine the core samples and data, and to draw their own conclusions as to the reliability of the estimates provided by Metro Government. The discrepancy between the estimates and the actual subsurface conditions remains unexplained, but without some proof of negligence on the part of Metro, the burden of risk may not be removed from the shoulders of the contractor.

## V

Construction of the road by Brown Brothers was accompanied by extensive utility relocation and construction. Both parties to the contract were aware that these necessary operations could cause delays in the schedule for completion of the roadway. The portion

of the contract that deals with utilities contains the following paragraph:

"The contractor will be solely responsible for contacting all affected utilities prior to submitting his bid in order to determine the extent to which utility relocation and/or adjustment will have (sic) upon the schedule of the work for the project. Some utility facilities may need to be adjusted concurrently with the contractor's operations, while some work may be required around utility facilities that will remain in place. It is understood and agreed that the contractor will receive no additional compensation for delays or inconvenience caused by the utility adjustments."

The contract also provided that Metro could collect liquidated damages for delay, measured by the number of days past the deadline date required to complete the roadway.

The job was completed on July 31, 1990, about six months after the deadline date. Metro waived its liquidated damages. Brown Brothers filed a claim for the additional costs it allegedly incurred as a result of delays owing to utility operations. The appellant essentially advances two arguments in support of its claim. The first argument is that the delays encountered were so far outside the expectations of the contracting parties that they should be exempted from the "no damage for delay" clause printed above. The second argument is that Brown Brothers had no authority over the utilities that caused its completion of the project to be delayed, and that Metro should have alleviated the situation by exercising the authority and leverage it possessed. We find both of these arguments to be without merit.

 Parties to a contract are free to allocate risks and burdens between themselves as they see fit. *Empress Health and Beauty Spa Inc., v. Turner*, 503 S.W.2d 188 (1973), *Trailmobile, Inc., v. Chazen*, 51 Tenn. App. 576, 370 S.W.2d 840 (1963); *Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960). The contract at issue clearly places with the contractor the risk of delay due to utility adjustment, and the burden of coordinating its operations with the affected utilities. The delays the appellant suffered were

exactly of the type provided for in the contract. As for the argument that the magnitude and the costs of the delays were so large that they were beyond the contemplation of the parties, we can find nothing in the record regarding the size of the actual losses the appellant suffered as a result of delays, or the magnitude of possible loss that was within the contemplation of the parties.

The appellant cites the case of *Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co.*, 355 F.Supp. 376 (S.D.Iowa, 1973) to bolster its argument that the "no damage for delay" clause should be disregarded. Of course this decision by an Iowa Federal District Court is not binding on Tennessee Courts, but even if it were, the appellant's reliance on the *Kiewit* case is misplaced, because it tends to support the appellee more than it does the appellant.

The plaintiff in *Kiewit* was the successful bidder on the general contract for construction of a fossil fueled steam generating plant. The structural steel, electrical and mechanical contracts were awarded to other companies. The contract specifically provided that time was of the essence. The worksite was a relatively small area, and the engineering firm that supervised the entire project faced the difficult task of coordinating the work of the various contractors within that congested space. A series of errors by some of the other contractors combined with unusually rainy weather that restricted access to the worksite, causing Kiewit to experience unexpected delays and cost overruns. At the conclusion of the job, Kiewit sued for its additional costs.

The court rejected all of Kiewit's claims. In discussing the effect of a "no damage for delay" clause, the court held that such clauses were valid, but that a contractor could recover for unreasonable delays notwithstanding such a clause, under four possible circumstances. These are "if the delay (1) was of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, (3) was caused by bad faith, or (4) was caused by active interference." *Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co.*, 355 F.Supp. 376, F.Supp. 376, at 397.

We have already observed that the delay in the present case was of a kind that was contemplated by the parties, so the first circumstance does not apply. Bad faith and abandonment of the contract are obviously not issues here. Brown Brothers does not allege active interference with its operations, but merely that Metro could have done more to compel the utilities to accommodate its needs. In defining the sort of active interference required to render a "no damage for delay" clause unenforceable, the *Kiewit* court found that some kind of reprehensible conduct was required, something far more affirmative than lack of total effort or lack of complete diligence. *Kiewit* at 397 and 399.

The appellant alleges no such conduct on the part of Metro.

The judgment of the chancellor is therefore affirmed, and the cause is remanded to the Chancery Court of Davidson County. Tax the costs on appeal to the appellant.

TODD, P.J., and KOCH, J., concur.